1      IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MONTANA

3           GREAT FALLS DIVISION

4

5   KEVIN WASHINGTON,              )
                                   )
6              Plaintiff,          )
                                   )     Civil Docket
7        vs.                       )     No. CV 20-2-BU-BMM-KLD
                                   )
8   MATTHEW BRENT GOETTSHE,        )
                                   )
9              Defendant.          )
    _____)

10

11           Transcript of Motion Hearing

12

13           Missouri River Federal Courthouse
                 125 Central Avenue West
14               Great Falls, MT 59404
                 Friday, January 10, 2020
15               11:07 a.m. to 1:50 p.m.

16

17       BEFORE THE HONORABLE BRIAN MORRIS

18       UNITED STATES DISTRICT COURT JUDGE

19

20           Yvette Heinze, RPR, CSR
             United States Court Reporter
21       Missouri River Federal Courthouse
                 125 Central Avenue West
22               Great Falls, MT 59404
             yvette_heinze@mtd.uscourts.gov
23               (406) 454-7805

24       Proceedings recorded by machine shorthand
    Transcript produced by computer-assisted transcription

25

1        **APPEARANCES**

2 PRESENT ON BEHALF OF THE PLAINTIFF:

3

4      Kris McLean
       KRIS MCLEAN LAW FIRM, PLLC
       PO Box 1136
5      Florence, MT 59833

6      Tyson A. McLean
       KRIS MCLEAN LAW FIRM, PLLC
7      315 W. Pine Street
       Missoula, MT 59802

8

9 PRESENT ON BEHALF OF THE DEFENDANT:

10
       John E. Smith
11      SMITH & STEPHENS
       315 West Pine Street
12      Missoula, MT 59802-4119

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    I N D E X

2
WITNESSES CALLED BY THE PLAINTIFF                                       PAGE

3
   RICK TABISH
4        DIRECT EXAMINATION BY MR. KRIS MCLEAN                            6
         CROSS-EXAMINATION BY MR. SMITH                                  36
5    JEFFREY PAPEN
         DIRECT EXAMINATION BY MR. KRIS MCLEAN                           44
6        CROSS-EXAMINATION BY MR. SMITH                                  79
         REDIRECT EXAMINATION BY MR. KRIS MCLEAN                         83
7    JOHN ORIZOTTI
         DIRECT EXAMINATION BY MR. KRIS MCLEAN                           85
8        CROSS-EXAMINATION BY MR. SMITH                                  91
9

10                                    ****

11

12                                  EXHIBITS

13   GOVERNMENT'S                                                   ADMITTED

14    Plaintiff's Exhibits 1 and 2                                       24
15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2        (Open court.)

3              THE COURT:  Please be seated.

4              Madam Clerk, please call the next case on the Court's

5     calendar.

6              THE CLERK:  This Court will now conduct a motion

7     hearing in Cause Number CV 20-2-BU-BMM-KLD, Kevin Washington

8     versus Matthew Goettshe.

9              THE COURT:  Good afternoon, Mr. McLean.

10             MR. KRIS MCLEAN:  Good afternoon, Your Honor.

11             THE COURT:  And who is with you at counsel table?

12             MR. KRIS MCLEAN:  My client, Kevin Washington.

13             THE COURT:  Good morning, Mr. Washington.

14             MR. WASHINGTON:  Good morning, Your Honor.

15             MR. KRIS MCLEAN:  And my partner, Tyson McLean.

16             MR. TYSON MCLEAN:  Good morning, Your Honor.

17             THE COURT:  Mr. McLean.

18             And Mr. Smith.

19             MR. SMITH:  Good morning, Judge.

20             THE COURT:  Good morning.

21             All right.  So we're here on a hearing motion filed

22     by plaintiff for appointment of a receiver.

23             Before we get started, let me point out there's a

24     second case nearly identical to this that was filed.  Is that

25     right?

1          MR. KRIS MCLEAN:  Yes, Your Honor.  I also represent

2    FX Solutions, Incorporate, and they have a separate complaint

3    that brings slightly different claims, but it is against the

4    same defendant.

5          THE COURT:  And all of the same principals involved.

6          MR. KRIS MCLEAN:  Yes, sir.

7          THE COURT:  All right.  Well, I would urge the

8    parties to file a motion to consolidate those cases, and I

9    consider that -- we're in the lead.  If you'd like, we can

10   consolidate it here and take both of those cases.  Get that

11   paperwork filed as soon as you can.

12         MR. KRIS MCLEAN:  We'll do that, Your Honor.

13         MR. SMITH:  We can file a stipulated --

14         THE COURT:  That would be even better.

15         MR. KRIS MCLEAN:  Yes.

16         THE COURT:  Okay.  Thank you.

17         MR. SMITH:  Thank you.

18         THE COURT:  All right.  Anything else to address?

19         Okay.  Let's get started, then.  Mr. McLean, did you

20   have any witnesses?

21         MR. KRIS MCLEAN:  We do have three witnesses we would

22   propose for the Court.

23         THE COURT:  Let's put on the witnesses first, and

24   then we can hear argument.

25         MR. KRIS MCLEAN:  Thank you, sir.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1    THE COURT:  Is that acceptable, Mr. Smith?

2    MR. SMITH:  Yes.

3    THE COURT:  Do you have any witnesses?

4    MR. SMITH:  I do not.

5    THE COURT:  All right.  Go ahead, Mr. McLean.

6    MR. KRIS MCLEAN:  The plaintiff calls Mr. Rick

7    Tabish.

8                          RICK TABISH,

9    called for examination by counsel for the plaintiff, after

10   having been first duly sworn to testify the truth, the whole

11   truth, and nothing but the truth, testified as follows:

12   THE COURT:  Please state your full name and spell

13   your last name for the record.

14   THE WITNESS:  Richard Bennett Tabish.

15   THE COURT:  Please spell your last name.

16   THE WITNESS:  T-a-b-i-s-h.

17   THE COURT:  Go ahead, Mr. McLean.

18                     DIRECT EXAMINATION

19   BY MR. KRIS MCLEAN:

20   **Q.**   Please tell the Court where you live and what you do for a

21   living.

22   **A.**   I live in Kalispell, Montana, and I have a contracting

23   company.  We're a heavy sealable contractor, consulting group,

24   construction management, and we have an emphasis on, you know,

25   building roads, buildings, infrastructures, environment

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  cleanups.  And our consulting group, we consult on a myriad of
2  different projects.
3  Q.  What is the name of your contracting company?
4  A.  FX Solutions, Incorporated.
5  Q.  What is your official title at that company?
6  A.  I'm the CEO of the company.
7  Q.  How long have you, approximately, owned and operated
8  FX Solutions, Inc.?
9  A.  Two and a half years.
10 Q.  Are you licensed, or is your business license as a general
11 contractor?
12 A.  Yes, it is.
13 Q.  Do you utilize subcontractors in conducting the contracts
14 to build?
15 A.  Yes, we do.
16 Q.  How does that work?
17 A.  Once a job is designated and awarded to us, part of our
18 team building is we'll find the right contractor, whether it be
19 an election, substation contractor, asphalt contractor,
20 whatever.  We guarantee payment to that contractor.  We
21 generally enter into a written agreement with that entity.  And
22 then we proceed through engineered plans, and we build a
23 project.
24 Q.  Are you familiar with an entity named CryptoWatt Mining,
25 LLC?

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **A.**  Yes, I am.

2  **Q.**  How are you familiar with that entity?  Have you done work

3  for them?

4  **A.**  Yes, I have.  We started a project in January of 2018, in

5  Butte, Montana.

6  **Q.**  Tell us how that project came about, how FX Solutions

7  became involved.

8  **A.**  We became involved -- Mr. Washington had introduced me to

9  the project and the ideology of the project.  And I had already

10  had a pretty good place in Butte with regard to an existing

11  project, meaning a nexus with the energy company, Northwestern

12  Energy; the counties, Anaconda, Butte-Silver Bow.  And by and

13  through those connections and relationships, I was able to

14  negotiate quickly to try to bring the CryptoWatt online as fast

15  as possible.

16  **Q.**  So generally describe for the Court what CryptoWatt was

17  going to do for business once you built this project?

18  **A.**  It was a Bitcoin mining facility.  They're basically

19  transaction -- they verify transactions through the blockchain

20  and get rewarded with a block reward, a Bitcoin.  That's -- in

21  short terminology, it's called Bitcoin mining.  It was very

22  electrical intensive and a large project.

23  **Q.**  Did you enter a contract with CryptoWatt Mining to build

24  the facility at Butte?

25  **A.**  Yes.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   Approximately, when did that contract begin?

2  **A.**   Sometime in February of 2018.

3  **Q.**   What did FX Solutions do under that contract?  What was it

4  required to do?

5  **A.**   We facilitated the negotiations with Northwestern Energy.

6  We facilitated the agreement and finality to the sale of the

7  MSE Complex.

8  **Q.**   What's the MSE Complex?

9  **A.**   It's the complex that is now CryptoWatt.  They call it the

10  MSE facility on 200 Technology Way.  It was formally MSE, now

11  CryptoWatt.  That's the facility where CryptoWatt now resides.

12  **Q.**   Was else was FX supposed to do under the contract?

13  **A.**   Build a substation.  We had to select contractors and put

14  together a team, an engineering team and a contracting team, to

15  facilitate the building of a 124-megawatt substation, all of

16  the distribution to the buildings, the engineering -- procure

17  the engineering to the buildings.  And the internal

18  distribution to the buildings was also under our guise.  We had

19  to select an electrician to do the work.  And then interface

20  with the county or local code, state and local and federal

21  requirements.  We had to make sure of that, along with the

22  safety of the facility and security of the facility.

23  **Q.**   Approximately, when did you begin construction?

24  **A.**   We actually started in January, the deconstruction of that

25  old facility, you know, removing all of the old equipment and

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  making way and clearing the building for the engineer design of

2  the new CryptoWatt mining facility.

3  **Q.**   January of which year?

4  **A.**   2018, sir.

5  **Q.**   When did you actually mine the first Bitcoin, produce

6  Bitcoin, at that facility?

7  **A.**   We were online in April of 2018, with the first 3

8  megawatts.

9  **Q.**   Who are some of the contractors that you employed in

10  Butte?

11  **A.**   Barnard in Bozeman, Barnard Construction; Ray Peterson

12  Electric was out of Anaconda; AFFCO Fabrication, out of

13  Anaconda as well for the rack building; McGree Trucking;

14  numerous amounts of -- basinal, I mean, we just -- at one point

15  we had over 200 employees working for us.

16  **Q.**   And when you were building this facility, who were the

17  principals of CryptoWatt when you first started?

18  **A.**   It would have been Dan Burrell and Kevin Washington.

19  **Q.**   Did you interface with those gentlemen during the course

20  of the construction?

21  **A.**   Yes, I did.

22          THE COURT:  What was the other name?  Dan what?

23          MR. KRIS MCLEAN:  Burrell.

24  BY MR. KRIS MCLEAN:

25  **Q.**   Could you spell that for us?

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **A.**   B-U-R-R-E-L-L.

2  **Q.**   So those were the two owners?

3  **A.**   Yes.

4  **Q.**   You testified that the facility became operational to a

5  small extent in April of 2018; right?

6  **A.**   Yes.

7  **Q.**   Would you describe for the Court what was going on in

8  April 2018 and then through the summer, the operation of that

9  facility generally, not in great detail but generally.  How did

10 the facility operate?

11 **A.**   With regard to management?

12 **Q.**   Mining Bitcoin.

13 **A.**   Mining Bitcoin.  It started this -- we had a contractor --

14 a different contractor, a networking contractor, a network in

15 the machines, and pointing them to what's called a wallet.  It

16 was actually a hosting -- the initial startup of that facility,

17 a hosting contract was negotiated whereby we would offer --

18 operate the -- furnish and operate the facility, and a

19 different entity would bring the machines in, and we would run

20 their machines for a fee.

21       So that went on until we got our next building.  It

22 was a phased approach to bringing everything online, and that

23 was the earliest source of revenue for the business.  The

24 decision was made to host, bring 3 megawatts on while the other

25 buildings were being brought online.  And that's -- that's

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  pretty much how it went.

2  **Q.**  How long did it take you to bring it up to full operation?

3  **A.**  It would have been sometime by September, October.

4  **Q.**  Of 2018?

5  **A.**  Yeah.

6  **Q.**  And when you say, "full operation," could you describe for

7  the Court -- you mentioned machines.  What machines are you

8  talking about?

9  **A.**  Well, everything was a phased approach.  We had as --

10  there's different buildings at the MSE Complex.  We would clear

11  them.  We would build -- in Peterson, we would strategically

12  open a building based on what machines we'd have.  That would

13  be a Bitcoin mining machine.  There was two different kinds.

14  There was a Bitfury machine that was a larger machine that ran

15  at a different wattage and a different terahash.  And then

16  there was a smaller machine called an S-9, which the racks were

17  different.

18          Based on the machines that Mr. Washington and

19  Mr. Burrell owned, which was a hybrid of the two, we tried to

20  get those machines to come on first just to get the revenue

21  base, you know, going on those and back against the capital

22  investment.

23          So we targeted the buildings that they were scheduled

24  for based on engineering, and we implemented those machines to

25  those buildings and tailored the electrical draw of the

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  substation because the substation was phased as well.  It was

2  phased by 66 megawatts per transformer.  So the first 66

3  megawatts came on first, and we had to fill that up.  And

4  that's kind of the phased approach we had to this.

5  **Q.**  Machines are computers?

6  **A.**  Machines are servers.  They're an A6 computer.  And the

7  more you put on, the faster they are able to solve an algorithm

8  to verify on the blockchain.

9  **Q.**  And when you had the Bitcoin mining facility of CryptoWatt

10  up to full operation, as you described in maybe the

11  October 2018 time frame, how many machines approximately?

12  We're not going to hold you to an exact number.

13  **A.**  There's roughly 32,000 machines at that facility.

14  **Q.**  And how much electricity is used to operate those machines

15  on its best day?

16  **A.**  Around 64 megawatts.

17  **Q.**  Where does that electricity come from?

18  **A.**  At the time it was coming from Talen Energy.

19  **Q.**  How was it transmitted to the facility?

20  **A.**  Northwestern Energy.

21       And I can explain that differential if you'd like.

22  **Q.**  Go ahead.

23  **A.**  Anything over 5 megawatts, you're required to use a choice

24  electric provider.  Northwestern Energy, the standard rate is

25  $120 a megawatt.  And in the sense of a choice operator, you

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  can get your commercial rates down to around $26 a megawatt.

2           So as the tariffs were anything over 5 megawatts,

3  they shift you off to choice electric, which at that time was

4  Talen.  So we do an energy contract with Talen.

5           And then the transmission contract is critical

6  because Northwestern Energy has to study.  They have to

7  determine if that amount of energy and that capability can be

8  fed through their transmission system.

9           So there's two phases to it:  the study, getting

10  Northwestern Energy to allow you to run that energy through;

11  and then procuring energy, the electrons to actually go through

12  the transmission lines.

13  Q.  What was the -- I think you said about 66 megawatts of

14  electricity was used at the Bitcoin facility?

15  A.  Yes.  Yes.

16  Q.  And how does that compare just to like the city of Butte?

17  A.  Butte runs about 38 megawatts.

18  Q.  So substantially more electricity is used at the

19  CryptoWatt facility than the entire city of Butte?

20  A.  Correct.

21  Q.  Once the facility was totally constructed and operational,

22  did FX Solutions continue to have a role in operating that

23  facility?

24  A.  Yes, we did.

25  Q.  What was FX's role in operating the facility?

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **A**.   We supplied the security for the facility.  Security was

2  very tight.  It's obviously a very expensive facility.  So from

3  security to the management of the servers and where they point,

4  we took direction on where to point the servers.  We made sure

5  that as many servers -- if there's 32,000 running, we,

6  obviously, want 32,000 working.  So as they drop off, we would

7  replace them.

8         The office and clerical, with regard to a certain

9  portion of the accounting, there was an interface between

10  CryptoWatt's office and our office.

11         And just all capital -- any capital investments going

12  forward, we would be in charge of engineering the presentation

13  to the owners.  That facility is actually approved up to 75

14  megawatts.  So there was an additional build-out.

15         And then servers change and different dynamics happen

16  where maybe they want to take the big box -- the Bitfury boxes

17  out and retrofit the S-9 -- S, dash, 9.  S-9 represent the bit

18  main -- or bit -- excuse me, bit main server, and a Bitfury is

19  a B-8, just for reference.

20         So there was situations where we would talk about

21  retrofit, and that was our job to pull old servers out and put

22  new ones in based on performance.  So anything that happened at

23  that facility, essentially, including the build-out, the office

24  build-out, just all decision-making, we would present to

25  management.  We would come with an engineered solution by and

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  through our company of engineers and present that to

2  CryptoWatt, and they would make the decision of whether they're

3  going forward.  But we were all-inclusive to answer your

4  question.

5  **Q.**  How many employees did FX Solutions -- or does FX

6  Solutions have at the CryptoWatt facility in Butte?

7  **A.**  Currently, 32.

8  **Q.**  And you mentioned something in your testimony about

9  pointing servers.  You took direction on pointing servers.

10  **A.**  Correct.

11  **Q.**  Would you describe for the Court what you're referencing?

12  What you mean by that?

13  **A.**  When you mine Bitcoin, it has to go to a wallet so -- a

14  digital wallet.  That's just how it works.  So as you are

15  producing -- there's a reward you get for cracking a block.

16  It's 12 and a half Bitcoin per every blockchain block that you

17  crack.  When you get that reward, it has to go to a wallet or a

18  place of destination.  That, we don't provide that.  That comes

19  from the management and -- you know, to their wallet, to

20  wherever they tell us to point that.  There's a -- and

21  Mr. Papen can expound on this.

22  **Q.**  Yeah.

23  **A.**  But it goes to a wallet at their direction that we sent it

24  to, and that's what houses the coin before they exercise and

25  take the coin out and turn it into currency.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   How does FX Solutions get paid for its services at the

2  CryptoWatt facility in Butte?

3  **A.**   We bill for facility maintenance.  We bill for the wages.

4  Any capital expenditures are charged out as well.  Basically,

5  we just invoice CryptoWatt.  You know, walk it across the hall.

6  Email it.  And it went through a chain of command to one of

7  their people who are in charge of their accounting department

8  there.  It was a two- to three-tier system that was ultimately

9  approved by Mr. Goettsche at that point when he owned the

10 facility -- or managed it.

11 **Q.**   Can you give us some idea of your monthly revenue paid by

12 CryptoWatt for FX services?

13 **A.**   It's pretty staple at $250,000 for everything we have, if

14 there is no capital expenditures.

15 **Q.**   Monthly?

16 **A.**   Monthly.  $250,000 a month, yes.

17 **Q.**   Now, you mentioned someone named Mr. Goettsche.  Who is

18 that?

19 **A.**   Matt Goettsche, at some point in August of 2018, became

20 the controlling member of CryptoWatt.

21 **Q.**   How did that impact or affect your job at FX Solutions,

22 Inc.?

23 **A.**   Well, it was kind of a blend from Mr. Burrell into

24 Mr. Goettsche.  And, ultimately, Matt had to approve

25 everything.  I mean, any capital expenditures or any expansions

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  were always run by Matt, and he had to okay them or deny them.

2  And, ultimately, anytime we were to get paid, his accounting

3  department would submit to him, and he would give the yes or no

4  of whether we were to be paid or not.

5  Q.   Did Mr. Washington have any role throughout the course of

6  your dealings with CryptoWatt in making sure FX got paid?

7  A.   No, not operationally.

8  Q.   That was Mr. Goettsche's role?

9  A.   It was all Mr. Goettsche's role.

10 Q.   And right now, today, who is, to your knowledge,

11 authorized to conduct financial transactions of CryptoWatt and

12 specifically pay FX Solutions, Inc.?

13 A.   It's nonexistent.  But the payroll checks --

14 Q.   No.  My question is who is authorized?

15 A.   No one.

16 Q.   Well, isn't Goettsche still the owner?

17 A.   Well, he's the owner, yes, so...

18 Q.   So he would have to be out of jail to pay you; right?

19 A.   Correct.

20 Q.   And that's not happening?

21 A.   No.

22 Q.   Okay.  Is anybody else -- can you go to anybody else

23 besides Mr. Goettsche --

24 A.   No.

25 Q.   -- for your invoices to be paid?

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **A.**   No.

2  **Q.**   You can't go to Mr. Washington?

3  **A.**   No.

4  **Q.**   Describe for us how that works with the Bitcoin being
5  generated at the Butte facility, going to a wallet as you
6  described, and then back to payment of your invoices into a
7  bank for FX Solutions.

8  **A.**   When the coin is generated, it goes to a wallet of their
9  designation.  From that wallet, they have to monetize it.  In
10 this particular case, to the best of my knowledge, it would go
11 to a company called Octagon in Hong Kong.  They would transfer
12 that Bitcoin at whatever price Bitcoin was at that particular
13 day.  And it would transfer -- after they charged their fee,
14 they would monetize it.  And then that money would be wired
15 back to a bank in the United States.  From that bank in the
16 United States, which this one happened to be First Bank Western
17 in Aspen --

18 **Q.**   Aspen, Colorado?

19 **A.**   Aspen, Colorado, yes.

20          They would wire the -- transfer the funds to us.  And
21 it would just go into CryptoWatt's account.  Either they would
22 give us a check if it was small.  If it was a large amount,
23 then we would get a wire, but it always came from First Bank
24 Western in Aspen, Colorado.

25 **Q.**   Do you have any ability at this point in time to contract

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  or work with Mr. Goettsche on CryptoWatt business?

2  **A.**  No, sir.

3  **Q.**  Why not?

4  **A.**  He's incarcerated.

5  **Q.**  What impact has Goettsche's incarceration had on FX's

6  business at the CryptoWatt facility?

7  **A.**  It's had quite an impact financially.

8  **Q.**  Is any Bitcoin being generated?

9  **A.**  No Bitcoin has been generated, and past bills that were

10  due prior to Mr. Goettsche's incarceration have not been paid.

11  And the facility, we're still maintaining the

12  security, and I still have a level of payroll happening at the

13  facility just to secure the facility.  You just can't walk

14  away.  The roof fans that are running that don't run now, snow

15  goes in.  So there's a lot of work that we refuse to walk away

16  from.  And it could be -- it's hundreds of thousands of dollars

17  worth of destruction if we're not there.  And, especially, if

18  we were to abandon it, it would be vandalized.  So it's a very

19  valuable asset that we're protecting and not getting paid for.

20  **Q.**  Do you know how those employees are being paid that are

21  monitoring the site and keeping it secure?

22  **A.**  I'm still paying them.

23  **Q.**  Are you getting any reimbursement from Mr. Goettsche or

24  CryptoWatt?

25  **A.**  No.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**  Is it accurate to say that all funding from CryptoWatt at
2  this time has ceased?

3  **A.**  Yes.

4  **Q.**  Can you give us some idea of what your weekly payroll is
5  that you are paying without being reimbursed by CryptoWatt?

6  **A.**  It's right about $36,000 a week.

7  **Q.**  And what has happened to the FX Solutions employees'
8  employment at this time at the Butte facility?

9  **A.**  Several of them have been laid off.  We just have a
10  skeleton crew that's working there.  And then those salaries
11  include upper management involved accounting.  We still have
12  accounting personnel, security personnel, and then some techs
13  that still walk around to maintain the integrity of the
14  building and the infrastructure.

15  **Q.**  You talked early during your testimony about the power
16  required to run the CryptoWatt facility at Butte.  Are you
17  familiar with the power contracts and how they work at the
18  facility?

19  **A.**  Yes, I am.

20  **Q.**  How are you familiar?

21  **A.**  I've pretty much had a hand in negotiating all of the
22  contracts since the infancy of the business.  So all of the
23  contracts that were in existence, I was involved whether it be
24  by my opinion or direct involvement of satisfying the energy
25  contracts.  Talen Energy, for instance, was the original energy

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  supplier.  And then after Talen backed -- they couldn't produce
2  any or didn't want to commit to anything after December of '18,
3  we moved to what's called Tenaska Energy.

4        So those energy contracts were negotiated at a price,
5  and you can lock in for a year, or you could go month to month,
6  which Matt was doing.  Recently, in the last six months, he was
7  just paying month to month.

8  Q.  Matt was paying month to month?

9  A.  Yeah, Matt Goettsche.

10  Q.  And you mentioned and described Northwestern Energy's
11  transmission lines and how they play a role at the Bitcoin
12  facility.  Does Northwestern Energy -- is that a bill that
13  needs to be paid for that transmission?

14  A.  Yes.  That's probably the most vital role because it takes
15  a lot of study time and a lot of commitment from Northwestern
16  Energy to provide that much transmission.  In that particular
17  facility, we had -- it was months before we could get up to the
18  full amount of megawatts and a lot of studies.  So you have to
19  take your place in the queue.  Everything is guided by FERC
20  tariffs and --

21  Q.  FERC?  What's that?

22  A.  Federal Electric Commission -- no, yeah, something like
23  that.

24        THE COURT:  Federal Energy Regulatory Commission.

25        THE WITNESS:  There you go.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  BY MR. KRIS MCLEAN:

2  **Q**.   And are you familiar with the status of CryptoWatt's

3  contract with Northwestern Energy to provide transmission

4  services for the electricity needed to run its Bitcoin mine at

5  Butte?

6  **A**.   Very fluent, yes.

7  **Q**.   What is the status right now?

8  **A**.   They are in arrears on -- I believe we just received a

9  letter from Mr. Cashell, the vice president of the

10  transmission.  They are approximately $320,000 in arrears.  And

11  how that works is you have 20 days to pay the bill when you get

12  the bill.  Once that bill is not paid, you go into default.  I

13  believe they issue letters to FERC informing them you have

14  another 30 days to bring that energy contract -- or excuse me

15  -- that transmission contract to a negative balance.  Providing

16  you don't do that and you default, you lose your place in the

17  queue and you go to the back of the line.

18          So for that facility, it's pretty much the death of

19  it.  If you don't have transmission, it doesn't matter if you

20  can buy energy.  And the energy companies won't sell you energy

21  anyway if you don't have a transmission agreement.  So the fact

22  that it's so arduous to achieve that and get an energy -- or a

23  transmission contract of that magnitude, it's really a blow.

24  If we lose that place in the queue, they'd move back five, six

25  places for everybody else who wants energy in that area.  And

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  we literally used all of the energy transmission up in

2  Southwest Montana.  You know, so there's no chance of

3  recovering that if this goes into default.

4          MR. KRIS MCLEAN:  Your Honor, could I approach the

5  clerk for an exhibit?

6          THE COURT:  You may.

7      (Handing document.)

8          MR. KRIS MCLEAN:  We're going to show on that screen

9  in front of you a couple of documents.  These are mentioned,

10  and I've already shown them to Mr. Smith, and he's agreed to

11  their admission.

12          Is that right, John?

13          MR. SMITH:  That's correct, Your Honor.

14          THE COURT:  Are they numbered, Mr. McLean?

15          MR. KRIS MCLEAN:  First, we'll look at Exhibit

16  Number 1, and then we'll look at Number 2.  So I offer those at

17  this time, Your Honor.

18          THE COURT:  All right.  No objection, Mr. Smith?

19          MR. SMITH:  No objection, Judge.

20          THE COURT:  Exhibit 1 and Exhibit 2 are admitted.

21      (Plaintiff's Exhibits 1 and 2 admitted into evidence.)

22      (Displayed.)

23  BY MR. KRIS MCLEAN:

24  Q.  Do you recognize Exhibit 1?

25  A.  Yes, I do.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   What is this?

2  **A.**   It's a notice of nonpayment.

3  **Q.**   And this says from Northwestern Energy.  Let's see the top
4  of it, please.

5       (Displayed.)

6  BY MR. KRIS MCLEAN:

7  **Q.**   Yeah, there we go.  Thank you.

8  **A.**   Yes, it is.

9  **Q.**   And how does this relate to the transmission -- the power
10 transmission contract that CryptoWatt needs to run its
11 facility?

12 **A.**    It basically cites the tariff on their -- the Open Access
13 Transmission Tariff, OATT, is basically where we register and
14 get certified.  We get certificates through that and also
15 through a portion called Oasis.  You have to have that in place
16 before you move into a study.  Basically, this is the
17 culmination of all of the results of Northwestern Energy's
18 permission that they are giving you and notifying you that that
19 dollar amount is due January 6th of 2020.

20 **Q.**   So on my screen, and hopefully on your screen, do you see
21 the amount?

22 **A.**   $319,659.47.

23       MR. KRIS MCLEAN:  If we could just move it up so that
24 we could see more of the letter, please.

25       (Displayed.)

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  BY MR. KRIS MCLEAN:

2  Q.   And this was due on January 6, 2020, according to this
3  Exhibit 1; right?

4  A.   Yes.

5  Q.   And Northwestern is letting CryptoWatt know Northwestern
6  has not received payment for this November 2019 invoice.  Do
7  you see that?

8  A.   Yes.  Correct.

9  Q.   And then it lays out the consequence of not paying.  If
10  CryptoWatt doesn't pay this bill, the letter describes what's
11  going to happen; right?

12  A.   Yes.

13  Q.   Generally, not good for CryptoWatt?

14  A.   Correct.

15       That references what I talked about earlier.  We lose
16  our place in the queue.  The facility shuts down with no
17  ability to energize other than just utility energy for the
18  lights and natural gas.

19  Q.   Can't get 66 megawatts?

20  A.   No.

21  Q.   Can't get 35 megawatts?

22  A.   You can't get enough to even run the fans, which is 5
23  megawatts.

24  Q.   This letter is signed by Michael R. Cashell.  Do you know
25  him?

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **A.** Yes, I do.

2  **Q.** Have you dealt with him?

3  **A.** Yes.

4  **Q.** And you're familiar with his authority at Northwestern

5  Energy?

6  **A.** Yes.

7     MR. KRIS MCLEAN:  If we could just look at the bottom

8  to make sure we've seen the whole thing.

9     (Displayed.)

10  BY MR. KRIS MCLEAN:

11  **Q.** Footnote 1 references a 30-day written notice to FERC;

12  right?

13  **A.** Correct.

14  **Q.** Are you familiar with that?

15  **A.** Yes.

16     MR. KRIS MCLEAN:  Let's look at Exhibit Number 2

17  then.

18     (Displayed.)

19  BY MR. KRIS MCLEAN:

20  **Q.** What is Exhibit Number 2?

21  **A.** It's their notification to Kimberly D. Bose of the Federal

22  Energy Regulatory Commission.

23  **Q.** Do you know what the purpose of this letter is?

24  **A.** To inform them that CryptoWatt is falling into default and

25  to benchmark a start date for the default period.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1          MR. KRIS MCLEAN:  If we could just move the letter up

2  to see more of the body, please.

3          (Displayed.)

4  BY MR. KRIS MCLEAN:

5  **Q.**   And this lays out, at least as far as Northwestern Energy

6  is concerned, the default of payment by CryptoWatt; right?

7  **A.**   Correct.

8  **Q.**   The history of nonpayment.

9  **A.**   Right.

10  **Q.**   And the consequences as well as we read down.

11  **A.**   Right.

12  **Q.**   And we can see that Northwestern Energy is letting

13  CryptoWatt know at the bottom that they may suspend

14  transmission service if the customer fails to secure default?

15  **A.**   Correct.

16          MR. KRIS MCLEAN:  Let's make sure we see the whole

17  page, please, and then we'll turn to page 2, just so we can

18  finish with the letter.

19          (Displayed.)

20  BY MR. KRIS MCLEAN:

21  **Q.**   Mr. Tabaracci, apparently, is general counsel for

22  Northwestern Energy?

23  **A.**   Yes, he is.

24  **Q.**   All right.  Thank you.

25          (Removed.)

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  BY MR. KRIS MCLEAN:

2  **Q.**   If CryptoWatt's transmission -- power transmission

3  contract with Northwestern Energy is not brought current by the

4  deadline set forth in Exhibits 1 and 2, what will happen with

5  respect to its operation at Butte?

6  **A.**   It will be shut down.  I mean, there's no sense in staying

7  there any longer.  It's just -- it's lights out unless somebody

8  pays.  There's two separate bills with Northwestern Energy.

9  One is the utility and just the ancillary use of lights, you

10  know, heat.

11       But with regard to energy to run the system, as I

12  stated -- I mean, the fans even in this type of weather, which

13  is crucial, it's a lot of destruction to a lot of equipment.  I

14  mean, not just millions; I mean, tens of millions of dollars.

15  **Q.**   Why can't we just wait the little while and bring the

16  contract current in a couple of months?  How is that going to

17  impact the long term?

18  **A.**   Because you will lose your transmission agreement, which

19  is the pipeline to the electrons to the facility.  And the way

20  that that system and that facility is wired, the commercial

21  energy to run it is on a completely separate circuit than it is

22  for the -- just the ancillary use of the utility energy.  That

23  means that facility doesn't function anymore.  You don't -- and

24  there would be no chance anytime soon, within years, really,

25  because of all of the people stacked up behind asking for

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  energy.

2  **Q**.   That's the part I wanted you to describe for the Court.

3  Based on your experience building these kinds of facilities and

4  negotiating these kinds of contracts, what do you mean it's

5  going to take years to bring this back, if you can at all?

6  **A**.   When we originally applied for transmission, we asked for

7  150 megawatts at that facility.  And then there was another ask

8  for a separate project out in Anaconda.  When the study came

9  back, Northwestern Energy had given us what they thought was a

10 safe amount of energy to start our projects that they felt

11 wasn't an issue for the study.

12         When they came back with the ultimate amount, they

13 first came back with only 50 megawatts available in Southwest

14 Montana.  So that meant that there's nothing.  There's no one

15 else, including a project that I had going on in Anaconda, that

16 could get energy.  Based on further study and working with them

17 and cross-engineering and offering different solutions, they

18 had come back months later and offered another 25 megawatts to

19 bring it to 75 total.

20         So that means that's it.  If that's all that's

21 available in Southwest Montana, no one else can get into the

22 queue.  If myself or another industry or business -- it's

23 locked everybody else out from moving forward.  Between REC,

24 between all of the business, MRI, the engineer -- the

25 commercial energy -- the energy transmission, I've discovered,

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1   is a garden hose, a garden hose that will haul 10 gallons a
2   minute.  The water is the energy.  You can't run 20 gallons a
3   minute through a 10-gallon hose.  So once they give you that
4   maximum capacity, it's done with.

5          So if CryptoWatt, essentially, loses that
6   transmission contract, the Anaconda project would step in its
7   place and all of the other people who want to mine or come in
8   that have been waiting for a place in that hub, they move into
9   that spot.  So there might be four.  There might be six.  I
10  don't know that right now, but there is people looking for
11  energy, you know, to start -- for businesses to start up.  Once
12  we lose, we go to the back, and you have to wait for everybody
13  else, and they get their shot, and that's where FERC comes in,
14  the regulations and the tariffs.  It protects everybody.  If
15  you don't use it, you lose it.  And especially if you don't
16  pay, you lose it.

17         And in this case the bill that is in arrears
18  basically cripples CryptoWatt from moving forward if it's not
19  paid.  I mean, the letter explains it explicitly.  They're
20  going to lose transmission.  Once that happens, you are out.
21  The next guy steps in line, and the energy goes to him.  So
22  that asset essentially becomes worthless other than property
23  value.
24  Q.  In your capacity at FX Solutions and specifically dealing
25  with CryptoWatt's Bitcoin mining facility at Butte, are you

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1   privy and knowledgeable about the amount of Bitcoin and,

2   therefore, money that is generated on a daily basis when that

3   facility is up and running?

4   A.   Yes.

5   Q.   How are you familiar with that type of information?  How

6   do you know?

7   A.   Our team led by Jeffrey Papen point everything through

8   what's the BTC pool.  The transparency and the level of

9   transparency that we developed in doing that allows us to see

10  how many machines are mining, how many machines are down, and

11  the amount of Bitcoin that's generated on a daily basis.  Based

12  on that, that figure is sent to the accounting department and

13  they track that.  Because, as law provides, we have to report

14  what's made, what goes into a wallet, and then again when it's

15  taken out of a wallet.  That's the proper measures of

16  accounting.

17          So the team that we put together on behalf of

18  Mr. Washington made that identification and that transparency

19  move so we can see everything.  We can see how much energy is

20  being used, how much Bitcoin is being made, how many -- what's

21  called petahash, what machines are running at.  I'll defer to

22  Mr. Papen on that explanation.  But, yes, it's very transparent

23  to us.  We're fluent with everything that happens in that

24  facility, including revenue stream.

25  Q.   We've asserted in our pleadings in this case that very

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  recently, that given the price of Bitcoin and when the

2  facility's up and running at full level, that as much as

3  $87,000 a day is generated at that facility.  Does that sound

4  about right?

5  A.   Based on the price of Bitcoin and the difficulty rating of

6  the coin, but, yes.  I mean, it's -- as difficulties go up,

7  obviously, revenue comes down, as the price of Bitcoin comes

8  down.  But at this point right now -- and I'll defer again to

9  Jeff -- I think it's around an 11-coin-a-day, whatever the

10  price of coin is.

11  Q.   All right.  You mentioned moments ago that with

12  electricity and the transmission -- power transmission

13  contract, CryptoWatt has a very valuable asset sitting there.

14  But you mentioned that without that power transmission

15  contract, the value goes to a real estate?

16  A.   Basically, yeah, because there's a use value that facility

17  had to undertake in a very comprehensive appraisal.  And in the

18  appraisal, it was -- I couldn't sum it up any better.  The real

19  estate value, you know, was somewhere around 10 million.  The

20  use value with no machines was around 62.  And it was over

21  $100 million worth of machines, which that kind of gives you

22  the different tier level of what it's worth.  But that's all

23  predicated on the fact that the facility would have energy.

24  Without energy, everything above the 10 million becomes moot.

25  It just becomes salvage value.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   If the CryptoWatt facility at Butte becomes operational
2  again, is FX Solutions going to hang in there and continue to
3  perform its contract to operate the facility?
4  **A.**   Yes.  I don't think we have a choice at this point.
5  **Q.**   What do you mean?
6  **A.**   Well, we've -- they are so far behind in bills, the only
7  way that we can recover is to have the facility running so that
8  we can hopefully make up some of the money in arrears.
9          And, again, the right thing -- I mean, the employees,
10  I care about my employees.  I care about all the ancillary
11  businesses that benefit from it.  So we have a desire to hang
12  in there and try to make it work.
13          And with respect to Mr. Washington as well.  I mean,
14  if it goes down, he needs an operator in there.  You know, if
15  it goes down, he loses as well.  So we're kind of -- we're
16  stuck.  We have to make everything work in order for any of us
17  to recover.
18  **Q.**   If the Court were to appoint a receiver, are you willing
19  to work with the receiver and enter a contract, a written
20  contract, with the receiver to describe your duties at FX
21  Solutions and operating the CryptoWatt facility?
22  **A.**   Absolutely.
23  **Q.**   Do you think a receiver is necessary to continue operating
24  that facility?
25  **A.**   Absolutely necessary.

RICK TABISH - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   Why?

2  **A.**   Because we need to bring the business to some sort of
3  normalcy to where the revenue that comes in on the business is
4  calculated, the bills are appropriately -- the cost of the
5  facility is appropriately taken out of the revenue and our
6  company gets paid, Northwestern Energy gets paid, the energy
7  company gets paid.  We haven't had that normalcy, and I think
8  that having a receiver, a responsible receiver, it will get run
9  like a business, and it will function like it's supposed to
10 function.

11 **Q.**   Now, we know that Mr. Goettsche is in jail right now
12 pending a federal indictment; right?

13 **A.**   Correct.

14 **Q.**   If he were to be released from jail, if his lawyers were
15 able to get him out pending trial or something like that and
16 he's available to conduct these transactions, do you think that
17 would help your situation with FX at CryptoWatt's facility in
18 Butte?

19 **A.**   No.  No.  And we weren't getting paid when Mr. Goettsche
20 was out of jail.  We're in arrears approximately $800,000 in
21 operational cost right now and in excess of $3 million in
22 capital expenditures.  So I don't know that any of my
23 subcontractors will work for Mr. Goettsche.  I'm certainly not
24 going to work for Mr. Goettsche.  The only person that I will
25 work for would be Mr. Washington at this point.

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1   **Q.**   And a receiver if we get one appointed; right?

2   **A.**   And a receiver, yes.

3           MR. KRIS MCLEAN:  Can I have just one moment, Your

4   Honor?

5           THE COURT:  You may.

6           MR. KRIS MCLEAN:

7    (Off-the-record discussion between Mr. McLean, Mr. McLean,

8       and Mr. Washington.)

9           MR. KRIS MCLEAN:  That's all I have, Your Honor.

10          THE COURT:  Thank you.  Mr. Smith.

11          MR. SMITH:  Thank you.

12                       CROSS-EXAMINATION

13  BY MR. SMITH:

14  **Q.**   It's almost noon.  Good noon, Mr. Tabish.

15          I just want to cover one thing first, and that is you

16  have testified here as CEO of FX Solutions, Incorporated?

17  **A.**   Yes.

18  **Q.**   And you're also the principal agent for FX --

19  **A.**   Yes.

20  **Q.**   -- Solutions Incorporated?

21          And FX was incorporated in the state of Montana?

22  **A.**   Yes.

23  **Q.**   And it's registered to an address in Missoula?

24  **A.**   Yes.

25  **Q.**   Beach Street?

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1  A.   955 Beach Street, yes, sir.

2  Q.   Okay.  So FX Solutions, Incorporated, is a Montana

3  citizen, at least so far as a corporation can be a citizen?

4  A.   Yes.

5  Q.   And we've heard a lot about Matt Goettsche and his

6  involvement in this situation.  He provided funding for

7  building the facility in the beginning; is that right?

8  Originally?

9  A.   Yes, sir, he did.

10  Q.   Tens of millions of dollars?

11  A.   Correct.

12  Q.   Kevin Washington put in some money too?

13  A.   Yes.

14  Q.   And we had a gentleman you mentioned by the name of Dan

15  Burrell?

16  A.   Dan Burrell, yes, sir.

17  Q.   He was originally managing -- well, he was CEO of

18  CryptoWatt mining?

19  A.   Correct.

20  Q.   But there was a problem with his management; correct?

21  A.   Yes.

22  Q.   So between Mr. Burrell -- because you are not part of

23  CryptoWatt Mining, are you?

24  A.   No, I'm not.

25  Q.   Or Crypto Watt Investment Partners?

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1  **A.**   No.

2  **Q.**   So Mr. Goettsche, Mr. Washington, and Mr. Burrell came to

3  some agreement, as far as you know, and Mr. Goettsche became

4  the CEO of CryptoWatt Mining --

5  **A.**   Correct.

6  **Q.**   -- in place of Dan Burrell?

7  **A.**   Yes, sir.

8  **Q.**   You've thrown a lot of figures around:  36,000 a week

9  payroll; 320,000 in arrears to Northwestern Energy,

10 approximately; some ancillary stuff owed to them as well.  Do

11 you have any idea what the cost to start up this operation is

12 going to be, including all of the arrearage?

13 **A.**   320,000 would be immediate.  You would have to post with

14 the energy company approximately one and a half million

15 dollars.  So it's going to take about a million and a half

16 dollars to -- they are going to ask for the money up front.  I

17 have been pre-negotiating this already, and that's going to be

18 a condition.  They are going to want their money paid up front.

19 They're going to want their money by the 15th of every month.

20 So you have to pay for your energy up front is how that works.

21        So your million and a half dollars -- a million eight

22 -- you're close to $2 million to start everything up.  In fact,

23 I would agree if the business starts, you know, to -- and I

24 don't need all my money back right away.  I'll take it over

25 time because we want -- obviously, we're concerned about the

1  survival of the business.  We want to make it cash flow.

2  Q.   Okay.  So at least $2 million?

3  A.   At least $2 million.

4  Q.   And where is that money going to come from?

5  A.   Between Mr. Washington and myself, we'll have to furnish

6  the money to make it move forward.

7  Q.   There was a decision that was made, I believe, in November

8  of 2019, to shut down the facility's operation during the month

9  of December; right?

10 A.   Correct.

11 Q.   And that's because the price of energy was going to be too

12 high per megawatt hour?

13 A.   Correct.

14 Q.   So it wasn't going to run throughout the month of December

15 anyway; right?

16 A.   Except for the -- it wasn't going to affect the employees.

17 There was -- Mr. Goettsche emailed me, texted me, and said he

18 would cover the cost of the employees and the facility

19 maintenance to keep everything moving.  Because that was one of

20 the concerns if we shut down during Christmas.  I mean, with

21 employees, it's pretty tough to keep them there.

22 Q.   Sure.

23 A.   So, yes.

24 Q.   So he was prepared, able, and intending to fund what he

25 needed to fund, but that you all decided you weren't going to

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1  mine Bitcoin in December?

2  A.   Correct.  He said he would fund that, yes.

3  Q.   Okay.  But then he got arrested?

4  A.   He got arrested, yes.

5  Q.   Okay.  You said that the facility becomes worthless except

6  for property value?

7  A.   Correct, property and salvage.

8  Q.   Okay.  Property and salvage if it's not mining Bitcoin?

9  A.   Yes.

10 Q.   Okay.  Do you have any knowledge of what Kevin

11 Washington's interest is in CryptoWatt Mining?

12 A.   I don't have -- I'm not real fluent in his agreement with

13 Mr. Goettsche.  I have heard things, but I don't know

14 contractually what his exact cost is in that.

15 Q.   So do you know that he's not entitled to the proceedings

16 of the mining operation at all?

17 A.   I have no knowledge of that.

18 Q.   And he's a minority shareholder?  Do you know that?

19 A.   Yes, he is.

20 Q.   Is the energy contract that you have going forward, if

21 you're able to go forward mining again -- and we're not talking

22 transmission.  We're talking energy, electrical energy.

23 A.   Correct.

24 Q.   Did you negotiate that with Energy Keepers?

25 A.   No.  We were negotiating with Energy Keepers prior to his

1  incarceration, and we were about a day away from doing a deal
2  with them.  Danny Howlett with Energy Keepers, they'd given a
3  price, an aggressive price, and it looked like Matt was going
4  to pull the trigger.  I was involved with introducing Matt to
5  Energy Keepers and interfacing that deal.  And the last emails
6  that I was copied on, they were looking for him and said, "We
7  have to do this."  And I didn't know he had been arrested yet,
8  and that deal kind of went by the wayside, and I've never been
9  able to recover that conversation with Energy Keepers again.
10 Q.   So you turned to Stephanie Toups?
11 A.   I asked Stephanie about Tenaska and her contract at
12 Tenaska and tried to get her to preface the previous deal and
13 where they were at, at the time that negotiation was happening.
14 And she graciously introduced me to one of the operatives at
15 Tenaska.  And from that point forward, I have been
16 communicating with him.
17 Q.   So is that where you expect your power to come from?
18 A.   Yeah.  We would start with them.  They have been
19 interfacing, and their counsel has been interfacing with
20 Mr. McLean to be sure with these proceedings.  Their concern
21 is, obviously, Mr. Goettsche's ability to come in and thwart
22 our efforts to move forward.  And they want to make sure that
23 the receiver is appointed and everything is legal.  And they're
24 willing to enter into something as long as there's a Court
25 order appointing someone responsible so they know they're going

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1  to get paid or that the contract can be signed under a legal

2  premise.

3          THE COURT:  Mr. Smith, can I interrupt for a second?

4          MR. SMITH:  Yes.

5          THE COURT:  Mr. Tabish, I thought you were going to

6  get your power from Northwestern Energy?  Is that the

7  transmission?

8          THE WITNESS:  The transmission, yes, sir.

9          THE COURT:  And the power is coming from Tenaska?

10          THE WITNESS:  Yes.

11          THE COURT:  Where are they?

12          THE WITNESS:  They're, I think, located in the

13  Portland area.

14          THE COURT:  Okay.  Go ahead.

15          THE WITNESS:  Energy broker.

16  BY MR. SMITH:

17  Q.   And Stephanie Toups -- and for the record Toups is

18  T-O-U-P-S.  Stephanie Toups is somebody you've worked with over

19  the months and years you have been in operation in mining?

20  A.   Originally, we had Bill Pasco.  And then Brad Beckstead,

21  who was the head accountant for CryptoWatt, I believe it's his

22  niece or relative of some sort.  He introduced her into the

23  process, and we discontinued doing business with Mr. Pasco in

24  favor -- or Brad and that in favor of Stephanie.

25          Stephanie, to my knowledge, originally worked with

RICK TABISH - CROSS-EXAMINATION BY MR. SMITH

1  Tenaska, had a pretty good nexus with them and a good rapport

2  and did a great job, frankly.  I mean, she had a great

3  interface with Tenaska and decent reporting.  Yeah, never had

4  any problem with her and enjoyed working with her.

5  **Q.**   Thank you.  That's all I have.

6         THE COURT:  Any follow-up, Mr. McLean?

7         MR. KRIS MCLEAN:  Nothing further, Your Honor.

8         THE COURT:  Is the witness excused?

9         MR. KRIS MCLEAN:  Yes, sir.

10         THE COURT:  You may step down, Mr. Tabish.

11         THE WITNESS:  Thank you.

12         THE COURT:  Mr. McLean, how many witnesses do you

13  have?

14         MR. KRIS MCLEAN:  Two more.

15         THE COURT:  And, Ms. Smith, do you have any?

16         MR. SMITH:  I don't, Judge.

17         THE COURT:  Okay.  Go ahead, then.  Call your next

18  witness, Mr. McLean.

19         MR. KRIS MCLEAN:  Mr. Washington call Jeffrey Papen.

20                 JEFFREY PAPEN,

21  called for examination by counsel for the plaintiff, after

22  having been first duly sworn to testify the truth, the whole

23  truth, and nothing but the truth, testified as follows:

24         THE COURT:  Good afternoon, sir.

25         THE WITNESS:  Good afternoon.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1        THE COURT:  Please state your full name and spell

2   your last name.

3        THE WITNESS:  Jeffrey Albert Papen, P-A-P-E-N.

4                      DIRECT EXAMINATION

5   BY MR. KRIS MCLEAN:

6   **Q.**   Would you please introduce yourself to the Court.  Tell

7   the judge where you live and what you do for a living.

8   **A.**   So I live in Wilsonville, Oregon, and I operate the

9   technical operations for FX Solutions.  The technical

10  operations basically being everything within the data center

11  that you would control via a keyboard as opposed to all of the

12  physical operations, which would be the electrical plant and

13  things like the fans and snow removal and such.

14  **Q.**   What is your education background that allows you to do --

15  or helps you perform these duties?

16  **A.**   I got my computer science degree from UCLA School of

17  Engineering in '95.

18  **Q.**   And what is the title of a job like the one you have at FX

19  Solutions?

20  **A.**   So the title is -- my title is VP of Mining Operations,

21  which basically means that we ensure that all of the machines

22  that are installed at the data center are generating as much

23  revenue as possible.  If you boil it down, it's to keep the

24  32,225 machines online as close to 24/7 as physically possible

25  and making sure that those machines are maximizing their

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  earning potential.

2  Q.   Tell us -- I want the judge to learn about your career,

3  briefly, and the experience that you have in this field that

4  allows you to perform your job at FX in a competent manner.

5  A.   Sure.  So I've worked since '95, when I got out of

6  college, at multiple online companies.  Most notably, from 2001

7  to 2003, I ran the backbone for Yahoo.  I started a hosting

8  company called Peak Hosting in 2001, as the founder and CEO and

9  managed that for 15 years.

10 Q.   When you say you managed the web backbone for Yahoo, what

11 does that mean?

12 A.   So at the time Yahoo had multiple data centers that were

13 conducted to multiple internet service providers.  And so my

14 job was to use networking protocols, such as BGP, to make sure

15 that they could connect to multiple ISPs, internet service

16 providers, so that if one of them had an outage that we could

17 move traffic, that traffic was balanced.

18         We also introduced something called private peering

19 where we could save millions of dollars a year by companies

20 sending traffic directly to each other.  I managed their

21 national backbone, interconnecting all of those data centers.

22 Q.   And then you mentioned that you owned your own business, I

23 believe, called Peak Web Consulting?

24 A.   Correct.

25 Q.   When did you start that entity?

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1    **A.**    So, in 2001, I started Peak Web Hosting, which was a

2    manage service provider.  And, in 2003, I started Peak Web

3    Consulting, which is where I would take my networking

4    engineering background and using that for multiple companies.

5    When I started Peak Web Consulting, I received Juniper

6    Networks.  They're a competitor of Cisco but create similar

7    products.  Their highest level of certification, which is their

8    Juniper Network Certified Internet Working Expert, I was

9    Number 116, which means I was the 116th person in the world to

10   receive that certification.  I was also a certified instructor

11   for Juniper.

12          And with Peak Web Consulting, we built the backbone

13   for MySpace.  We also built the network for Facebook.  We built

14   Hulu from news coin NBC.  We helped YouTube design their first

15   national backbone.  And we also helped Netflix with their

16   national background to give examples of the customers that we

17   worked with between 2003 and approximately 2008, 2009, on the

18   consulting side.

19          Simultaneously, I was also growing my hosting

20   company, Peak Web Hosting, which is where, as a hosting

21   provider, you can think of it today, we would call it a cloud

22   provider where we buy the servers and the storage and the

23   networking equipment and the data center and basically provide

24   all of the infrastructure that you need to run a company.

25   Notable customers that we had at Peak Web Hosting was Uber, the

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  car riding service.  We had them as a customer for
2  approximately three years where they grew from 10 servers to
3  over 500 servers and then went on to build their own data
4  centers hosting thousands and thousands of servers.  Another
5  customer would be VUDU, which is the online streaming service
6  now owned by Walmart.

7  Q.   Are you familiar with an entity or business named Core
8  Scientific?

9  A.   Yes, I am.

10  Q.   How are you familiar with that business?

11  A.   I worked for Core Scientific as their VP of operations in
12  2018.

13  Q.   What was Core Scientific's business?

14  A.   Core Scientific was a hosting provider for mining Bitcoin
15  mining companies, meaning that they would provide the data
16  center space and the operations to keep servers online, but the
17  servers were owned by a third party, and that third party would
18  pay a hosting fee monthly and then -- but would actually
19  receive the Bitcoins directly into their own wallets.

20  Q.   How is it that you came to work for FX Solutions, Inc.?

21  A.   I was introduced to Kevin Washington in the spring of
22  2019, through a mutual friend.

23  Q.   Where did it go from there?

24  A.   So I was introduced because Kevin Washington had concerns
25  that the revenue he was seeing and the amount of mining that he

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  was seeing was below what was to be expected.  And he had

2  concerns that it wasn't being operated as well as it could and

3  asked me to audit the infrastructure so that he could

4  understand whether or not he was getting a fair return on his

5  investment.

6  **Q.**   When did you begin working for FX Solutions in that

7  capacity, approximately?

8  **A.**   I think it was May of 2019.

9  **Q.**   What is your title at FX Solutions?

10  **A.**   VP of mining operations.

11  **Q.**   What is your job?  What's your job duties?

12  **A.**   Oh, I'm responsible for making sure that the machines are

13  online and that the machines are able to generate the maximum

14  earning capacity possibility.

15  **Q.**   Do you have any responsibility for making sure that the

16  machines and the product are accounted for correctly?

17  **A.**   Absolutely.  That's a key part of our job is that any of

18  the 32,225 machines that are offline is lost revenue that you

19  will never get back.  So we need to make sure that we have

20  every machine accounted for and understanding what state they

21  are in.  And if any of those machines fail, that we are able to

22  bring them back online and repair them as soon as possible.

23  **Q.**   And generally speaking, how do you do that?  Not too much

24  detail.

25  **A.**   Sure.  So the first thing is that every machine has a

1  physical asset tag so that we know how many they are, we can

2  uniquely identify each machine, and we know physically where

3  they are located within the seven different buildings so that

4  we can go find them.

5         Then we have polling software that will go and talk

6  to every server approximately every five minutes asking about

7  its health, how its hashing is doing, what its temp is, what

8  its fan speeds are to make sure they're operating normally.  We

9  also have software that will talk to the mining pool service,

10  and that is the -- when they talk about pointing miners at a

11  pool, that's the company that basically keeps track of the

12  effort of our mining and allows us to know from their

13  perspective how many machines they think we are actually

14  contributing.  Because we could see 100 percent of our servers

15  online, but if the pool server does not see every server

16  communicating with it, we will not get credit for that work.

17  So you have to correlate those two to make sure that every

18  machine is accounted for 24/7.

19  **Q.**   And that's what you do at FX, among other things?

20  **A.**   Yes.

21  **Q.**   Now, in this case, we have petitioned the Court to appoint

22  a receiver of CryptoWatt, and we have attached to our proposed

23  order for a receiver for the Court's consideration a document

24  we've entitled, "The Bitcoin Protocol."  Did you play a role in

25  helping us develop that Bitcoin protocol for the Court's

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  consideration?

2  **A**.   Yes.

3      MR. KRIS MCLEAN:  And, Your Honor, this is attached
4  and a part of the case.  I don't want to spend too much time on
5  it, but I do have a few things I'd like to ask Mr. Papen about
6  the protocol.  And, of course, we'd be happy if the Court had
7  any questions as well.

8      THE COURT:  All right.

9      MR. KRIS MCLEAN:  Could I approach and put --

10      THE COURT:  Please.

11   (Handing document.)

12      THE COURT:  My goal by the end of the hearing,
13  Mr. McLean, is to be able to explain the blockchain system to
14  someone.

15      MR. KRIS MCLEAN:  We're going to have to work on that
16  then.

17   (Displayed.)

18      THE COURT:  All right.  Is this an exhibit or just
19  for demonstrative purposes?

20      MR. KRIS MCLEAN:  I'm sorry?

21      THE COURT:  Is this document going to be an exhibit,
22  or is it just for demonstrative purposes?

23      MR. KRIS MCLEAN:  We've got it attached to our
24  pleadings in the proposed orders, so I don't know that we need
25  it as an exhibit.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1      THE COURT:  All right.  Go ahead, please.

2      MR. KRIS MCLEAN:  Just demonstrative.  Thank you,

3  sir.

4  BY MR. KRIS MCLEAN:

5  **Q.**  Is this the Bitcoin protocol that we have on the screen

6  that is attached to the proposed order we submitted to the

7  Court?

8  **A.**  Yes.

9  **Q.**  And as you've already said, you helped develop this?

10 **A.**  Yes.

11 **Q.**  And I played some role in editing it further?

12 **A.**  Yes.

13 **Q.**  And you even asked other colleagues for assistance in

14 developing the document?

15 **A.**  Absolutely.

16 **Q.**  All right.  Could you just tell us what Bitcoin is as a

17 digital currency?

18 **A.**  Sure.  It's a digital currency that is stored only in

19 online forums, meaning either on a server or in a digital

20 wallet or on a mobile device.  It's not a real currency that

21 you can hold in your hand or print.  It is -- leverages

22 encryption in blockchain technology, and they're generated

23 through Bitcoin mining.

24 **Q.**  In our first paragraph of the Bitcoin protocol that is on

25 your screen, we see that term "digital wallet" there.  Do you

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  see that?

2  A.   Yes, I do.

3  Q.   And tell us, you know, in some more detail, what is a

4  digital wallet and how does it work for CryptoWatts coin?

5  A.   Sure.  So a digital wallet is basically a file folder, you

6  can think that -- where your wallets are stored.  The thing

7  that makes it special is the amount of security that goes into

8  making sure that not everybody can read it.  Because one of the

9  plus sides and down sides of digital currency is that they are

10  only online, which means security cannot be achieved through

11  things like locking it in a safe.

12         And so a digital wallet is simply a service where you

13  can have multiple layers of access, meaning multiple people

14  have to authorize.  You can have multiple levels of passwords

15  that allow you flexibility and creativity and how many people

16  have to be involved to authorize removal of Bitcoins from the

17  wallet.

18  Q.   And CryptoWatt then contracts with companies that hold the

19  digital wallets, as I understand it?

20  A.   I wasn't involved with how Mr. Goettsche stored the

21  wallets.  But I know that for Mr. Washington, when we were

22  managing his wallet, we would work with BitGo to set up a

23  digital wallet for Mr. Washington so that when we were managing

24  his servers, that they would be directed to a worker ID that

25  would then write -- or sorry -- all of the daily proceedings

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  would be put into Mr. Washington's wallet.

2  **Q.**  And the next paragraph we see that term "miners" in parens

3  and we talked about miners.  What are the miners at CryptoWatt?

4  **A.**   So these are specially purposed machines that can only be

5  used for generating Bitcoins.  They are ASICC.  That's

6  A-S-I-C-C.  And the ASICC machines are not like a general

7  purpose computer like a laptop.  They can only perform the

8  hashing algorithm unique to Bitcoin.

9          And a typical machine like the S-9 can do

10  approximately 13.5 trillion hashing operations per second.

11  That would be 13.5 terahash -- T-E-R-A-hash -- would be the

12  speed at which that machine is clocked.

13          Another machine that was mentioned was the Bitfury

14  B-8 -- letter B, eight -- that can do approximately 49 terahash

15  per second.  So different machines have different performance

16  characteristics, and they also have different power

17  requirements.

18  **Q.**   We have in that second paragraph of the proposed protocol

19  the Number 32,225 such miners.  And are you familiar with that

20  number and helped us develop it?

21  **A.**   Absolutely.  That's the total of all of the miners that

22  are operating through the seven buildings.  That number may

23  fluctuate as power in certain areas is either brought online or

24  taken offline, but it doesn't deviate by more than, say, 60 or

25  80 servers.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

Q.   We also have that term "pool servers" in this paragraph.
What is a pool server?

A.   So the way that Bitcoin mining works is that there are
collections of servers that all of the miners communicate with.
And so what happens is if you were to take, say, the top
probably 9 -- 9 or 10 pool servers, you would have -- over
95 percent of the global hashing would be accounted for.

        And so what these pool servers do is if there's -- we
use BTC.com as our pool server, and it has about 18 to
20 percent of the global hashing power within that pool.  And
that represents thousands of companies like ourselves that
point our machines at their pool to basically collect and --
collect all that hashing power and then, as we are processing
the next block on the blockchain, to distribute who is going to
actually do what part of the hashing.  It's like a traffic cop
for divvying up the work.

        And all of the different pool servers -- like I said,
the top ten or so represent about 95 percent of the global
hashing -- they communicate with each other for when one of
those pool servers is what we call popping a block, which
happens approximately every ten minutes.  And it's essentially
public distributed accounting software to keep track of all of
the effort of who is mining where to determine who should get
credit for the next block being added to the blockchain.

Q.   And what is the "proof of work" as we see highlighted in

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  the second paragraph?

2  A.  Right.  So when you think of Bitcoins, a Bitcoin itself

3  doesn't have any intrinsic value.  You can't do anything with

4  it.  You can't burn it to create heat.  You can't eat it.  It

5  has value because we say it has value.

6         And one of the ways that we can feel good -- if you

7  can see me doing air quotes -- about a Bitcoin having value is

8  that we know, unlike US dollars, there's no federal reserve

9  that can suddenly print more and drive up inflation.  There's a

10  fixed schedule by which they are going to be released.

11         We also know that the blockchain is a public record

12  that you can see every transaction.  Every Bitcoin that is

13  created has a unique identifier around it.  And you can see

14  every record for every blockchain that's ever been earned.  And

15  every time someone sells a Bitcoin, transfers a Bitcoin, does

16  whatever with a Bitcoin, that is written to the blockchain.  So

17  it's basically a public ledger of all transactions.

18         So that's a way that people can trust that there's

19  transparency and that there's no one government or one body

20  that can suddenly change the policy of how Bitcoins are going

21  to be created so that there's trust that for better or worse

22  it's an even playing field on how these Bitcoins are produced.

23         Now, when it comes to mining, they have to answer the

24  question who deserves getting the Bitcoins?  If these Bitcoins

25  have value, how are we going to say that this company is going

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  to get the Bitcoins versus that company?  So there's this
2  notion of proof of work.  And what proof of work means is that
3  the pool server keeps track of -- for example, CryptoWatt had
4  32,000 machines that were sending the equivalent of 600,000
5  terahash of hashing power amongst all the other -- they have
6  approximately 10 million terahash of hashing power in
7  aggregate.  So we would be a relatively large percentage of
8  their total pool.  That they're able to say if we in a 24-hour
9  period made 100 Bitcoins or earned 100 Bitcoins, that I know
10 CryptoWatt's 600,000 terahash should get its pro rata share
11 based on that.

12        And so every time a miner is hashing, it's getting
13 the direction from the pool server, and the pool server is
14 calculating who did what work so that it knows how much of the
15 reward should it distribute to everyone involved.

16 Q.  And that's proof of work?

17 A.  And that's the proof of work is the communication between
18 the miners themselves and the pool servers, and the pool server
19 tabulates that.  And so every ten minutes when a block is added
20 to the blockchain, currently 12 and a half Bitcoins are
21 rewarded.

22        And depending which of -- if I say the top ten pools,
23 only one of those top ten pools is actually going to earn the
24 reward every ten minutes.  But if you look at the statistics.
25 It actually works out to be pretty even between them, that

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  there's no pool that's necessarily luckier than any other pool.

2  And if you were to average over, say, a 24-hour or a 72-hour

3  period, they don't deviate more than say 1 percent between how

4  big the pool is and what percentage of the reward they received

5  averaged over time.

6          MR. KRIS MCLEAN:  Let's move our Bitcoin protocol up

7  a little bit so we can see the blockchain background.

8      (Displayed.)

9  BY MR. KRIS MCLEAN:

10 Q.   And I think you probably talked enough about that at this

11 point, so let's move to how Bitcoin uses the blockchain.

12 A.   Sure.  So the blockchain is where all of the

13 transactions -- who received the Bitcoins, if I sell a Bitcoin,

14 if I transfer it from my wallet to your wallet -- all of that

15 gets written to this blockchain.  And it's chunked up into

16 ten-minute intervals, and it's that record that gives the

17 transparency for people to trust -- as much as you can trust a

18 digital currency -- Bitcoin, that they know where these coins

19 are going and who owns what.

20 Q.   And so we actually assert the protocol that blockchain

21 technology, it records every transaction for each Bitcoin?

22 A.   Correct.

23 Q.   What wallet each Bitcoin was originally earned into?

24 A.   Correct.

25 Q.   How Bitcoins or fractions of Bitcoins are moved around

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  between wallets?

2  **A.**   Correct.

3  **Q.**   So this is all accounted for?

4  **A.**   Yes.

5          And what's interesting is that there's actually fees

6  paid because if there are more transactions that can -- that

7  need to be done than can fit in that particular block, the

8  people who will pay a higher transaction fee will get bumped to

9  the front of the line and written to the block.

10         And the fees that you have can vary dramatically.

11 When Bitcoin was at an all-time high, people were paying over

12 $60 per transaction or around $56 per transaction.  Right now,

13 a transaction fee would be about 60 cents to write something to

14 the blockchain, so it varies.

15         MR. KRIS MCLEAN:  Let's turn the page of the

16 protocol, please.

17      (Displayed.)

18 BY MR. KRIS MCLEAN:

19 **Q.**   BTC rewards, would you -- you mention 12.5 Bitcoins, BTC,

20 and the fact that that's awarded to a pool.  And you talked

21 about the pro rata portion.  You've talked about a lot of this.

22         I'd like to direct your attention down towards the

23 last sentence because it relates directly to CryptoWatt.  You

24 write, "When CryptoWatt's Butte Bitcoin mining facility

25 operates at full capacity, it could theoretically earn between

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  10.9 and 12.1 BTC per day, which aligns well with the actual

2  11.2 to 11.8 BTC earned per day in the last three weeks of

3  November 2019."

4        What are you referencing?

5  **A.**   So there's the notion that -- I'm sorry.  Let me start

6  over.

7        With Bitcoin mining, if you know how many machines

8  are operating worldwide and you know how much total hashing

9  power is going on worldwide and you know how much hashing power

10 is yours specifically, you can be within 1 or 2 percent able to

11 calculate in advance how much you should be earning.  Because

12 it's very uniform and egalitarian in terms of all hashing power

13 contributing to that, you should get your pro rata share.

14       So, for example, 600,000 -- 600,000 terahash or 600

15 petahash is what the Butte facility, when all of the machines

16 are operating at full steam, can achieve.  We know that if

17 there are approximately 12.5 Bitcoins being generated every ten

18 minutes that over a 24-hour period, you can do the math for how

19 many Bitcoins there are.  And if we knew we were at 1 percent

20 or a half of a percent or a tenth of a percent of what the

21 global hashing power was, we should get that exact same amount

22 of Bitcoins over that given time period.

23       When people talk about the difficulty, what they're

24 basically saying is the difficulty is a nice even number for me

25 to think about for how many machines are globally operating.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  For example, right now there are approximately 110 exahash,

2  which is 110,000 petahash of global hashing power, and the

3  difficult will be 14.8 at the -- the difficulty is adjusted

4  every two weeks.  And at the next difficulty adjustment it's

5  going to be at 14.8.  That number is a lot easier -- 14.8 is a

6  lot easier for people to relate to than saying 119,000 exahash.

7          I'm sorry.  Did you have a question?

8          THE COURT:  No.

9          THE WITNESS:  Okay.

10  BY MR. KRIS MCLEAN:

11  **Q.**  So let me interrupt you because we're talking about the

12  use of BTC.com at CryptoWatt.  That's what I would like to

13  focus on so the Court understands why you selected that pool --

14  **A.**  Sure.

15  **Q.**  -- and how it's going to work to help the receiver if a

16  receiver is appointed.

17  **A.**  Thank you.

18          So BTC.com is one of the largest pools.  It's either

19  the largest or in the top three.  They change on a weekly

20  basis.  And BTC.com has far and away the best services in terms

21  of providing an application program interface for our software

22  tools to go make requests of the pool server and say, How many

23  machines are online?  What is each machine performing?  What's

24  each machine's unique identifier that we've assigned to it?  So

25  that if BTC.com thinks that a particular machine is only doing

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  5 terahash and not 13 terahash, we can go investigate that
2  machine and repair it and figure out why.

3       It provides transparency, which is huge, because you
4  don't want a machine -- you don't want a pool server to just
5  say, "Here's how many coins you've got over a 24-hour period."
6  **Q.**   Take my word for it.
7  **A.**   Exactly.  You want to be able to back into "How did I
8  arrive at that number?"  Because one of the great things about
9  BTC mining is that if you understand the math, which is just
10 simple algebra, you can calculate within a few percentage
11 points how many coins you should be earning.

12      And that's why that in -- based on the difficulty in
13 the last few weeks of November, meaning how many people
14 globally were hashing, and how much percentage of the facility
15 -- I'm sorry -- what percent of the global hashing power our
16 facility represented, we should get this many coins.

17      And one of the interesting things about when we were
18 operating the facility, just in the September time frame,
19 Mr. Goettsche asked us to manage his equipment as well as
20 Mr. Washington's equipment, that we were within 0.2 percent of
21 our theoretical maximum earning capacity.  Where before we had
22 been brought on to manage it, they were below that theoretical
23 best earning case by 16 to 25 percent on a monthly basis.  So
24 by being able to use our tools and our way of managing this, we
25 were able to maximize Mr. Washington's investment.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  **Q.**   Let's move on to how Bitcoins are paid out.  And I think
2  we have probably covered this sufficiently.  Let's take a look
3  at it briefly.

4  **A.**   Yes.  So Bitcoins are paid out where -- the way that a
5  pool service keeps track of everyone contributing to it -- for
6  example, like BTC.com -- is that miners have worker IDs.  And
7  if Mr. Washington has a worker ID associated with his wallet
8  versus Mr. Goettsche has a different worker ID associated with
9  his wallet, depending on what worker ID you can figure a miner
10  to point to -- is the phrase that we use -- that one person or
11  the other will get the credit and earn the money associated
12  with that.

13  **Q.**   You know, precisely, miner by miner because they're
14  identified uniquely.

15  **A.**   Exactly.  That's why when we go to BTC.com, you will see a
16  listing for all 32,225 miners individually, how much they are
17  performing in their historical performance to know machines
18  that need to be repaired.

19  **Q.**   So let's talk to the Court about when a customer is ready
20  to cash out these coins and what you write about these exchange
21  businesses.

22  **A.**   Sure.  So when you first set up an account with BTC.com,
23  you want to tell them what wallet is associated with that
24  account.  And if you don't give them -- if you set up an
25  account without giving them a wallet, they will just store it

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  in escrow.  Once you have those coins in your wallet and you

2  want to convert those wallets to, say, US dollars, there is a

3  service called an exchange service that will basically sell

4  those Bitcoins and take a transaction fee, typically like

5  1 percent, and they will convert it to US dollars.

6  Q.   We list those here.

7  A.   Correct.  You have Binance, Coinbase, Gemini, Kraken.  You

8  could just Google Bitcoin exchanges, and there will be hundreds

9  of them.

10  Q.   All right.

11  A.   And so what they do is you then contact your wallet and

12  whatever services is managing your wallet, go through the

13  process of the checks and balances around how many people have

14  to authorize transactions.  Then your wallet will transfer it

15  to the exchange company.  The exchange company will sell your

16  Bitcoins.  Those transactions -- I'm sorry -- the US dollars,

17  when they convert them into US dollars, they then have wiring

18  instructions to what bank you want that money to go to.  And

19  you can pre-configure all of those settings in terms of what

20  wallet to accept from and what bank to wire into with the

21  exchange server in advance and have controls around -- this

22  cannot be modified or changed without permission from these

23  particular individuals.

24  Q.   And, indeed, that's what you are actually proposing in the

25  Bitcoin protocol for use by the receiver if we are appointed a

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  receiver in this case; right?

2  **A.**   Correct.   There's multiple steps when you think of how the
3  money flows, which goes from the machines themselves.  Do they
4  have right worker ID -- I'm sorry.  Are they pointed at the
5  right pool server and have the correct worker ID to make sure
6  that they are getting mapped to a specific wallet, and that
7  wallet can only be, basically, liquidated to a given exchange.
8  And that given exchange can only transfer the US dollars to a
9  particular bank account.  And all of that can be pre-configured
10  and ratified such that it can't be changed without having a
11  particular number of people involved, and those people we can
12  determine at the start.

13  **Q.**   So let's talk about that specifically.  If we look a
14  little further here in the protocol under the heading "Bitcoin
15  Transactions Security" in this case.

16  **A.**   Correct.

17  **Q.**   So you've generally described how it's going to work.  Now
18  let's talk about what we have detailed for the Court's
19  consideration.

20          You mention that FX Solutions has been the technical
21  and operational contractor for CryptoWatt since the inception
22  of CryptoWatt's Bitcoin mining facility in January 2018.  And
23  you assert that, therefore, FX has unique and very important
24  qualifications and expertise on how to run the CryptoWatt
25  facility and keep track of the Bitcoin produced there.  Right?

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  A.   Absolutely.  We've actually developed a lot of custom

2  software specific to the management of this facility, including

3  being able to generate a list automatically every day of the

4  top machines that are underperforming and then being able to

5  give out their exact location.  And building rack row shelf

6  number to the data center text so then on a daily basis they

7  can know what their work orders are.  These machines are having

8  problems.  Go investigate and repair.  So we've customized that

9  software to be able to maximize our uptime.  That's how we can

10  get that 0.2 percent below our theoretical perfection.

11          And in addition to that, we also have the software to

12  automate what pool service and worker ID we assign every one of

13  those machines to make sure that no machines are being pointed

14  to an incorrect location.

15  Q.   And so you're suggesting for the Court that the order

16  include this protocol that says, "The receiver will utilize FX

17  Solutions, Inc.'s expertise to ensure that all Bitcoin

18  transactions required as part of his duties and authority will

19  be structured for accountability and security as follows."  And

20  then we describe the process that you have laid out to ensure

21  accountability and security of all the Bitcoin produced at

22  CryptoWatt's Butte Bitcoin mining facility; right?

23  A.   Absolutely.

24  Q.   Let's take a look at that.

25          And I asked you to actually address these three items

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  -- one, two, and three -- from a security standpoint.  That was
2  what we asked you to address; right?
3  **A.**   Yes.
4  **Q.**   To make sure that all miners in CryptoWatt's Butte Bitcoin
5  mining facility mined the correct BTC account and associated
6  wallet; that no Bitcoins are incorrectly removed from the
7  CryptoWatt's wallet -- from CryptoWatt's wallet; and, three,
8  that CryptoWatt's Bitcoins are converted to USD and moved to
9  the correct bank account.  That's what we want to accomplish
10 here and guide the receiver on how to make this happen.  Right?
11 **A.**   Correct.  This at a high level are the three major steps
12 that you have to ensure that all of the money that is being
13 earned gets to the appropriate bank account and that nothing is
14 misappropriated along the way.
15 **Q.**   So with respect to ensuring that all CryptoWatt Butte
16 Bitcoin mining facility miners are mined to the correct wallet,
17 generally tell us how that's going to work.
18 **A.**   We have written software that will automatically configure
19 all 32,000 machines to point at a specific pool and in that
20 pool have a specific worker ID, that worker ID being associated
21 with the wallet that we would create for this account.
22        The next step is that that wallet can -- when you
23 create the wallet, you can have as elaborate or draconian of a
24 process as you want to authorize moneys removed from that
25 wallet.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1    There's a process called KYC, or Know Your Customer,

2  where they will do video conferences.  You have to show them

3  your passport and your driver's license to verify you are who

4  you say you are.  We can specify any number of individuals that

5  have to be involved.  In this particular example, we used the

6  trustee and the CFO as being two people.  But if there needed

7  to be more, that's absolutely possible.  And then you can also

8  specify in advance that wallet can only be sent to a particular

9  account at a particular exchange.

10    Then when you create the account with the exchange,

11  you can also specify and codify in advance that any moneys

12  received from this wallet can only go to this US bank account

13  and no other place.  So you've basically trapped or funneled

14  the flow of the proceeds and deterministically know that

15  whatever is created here at the Butte facility can only

16  ultimately end up as cash in this particular checking account.

17  Q.    And that's what we've set forth in the proposed

18  protocol --

19  A.    Yes.

20  Q.    -- that we've been looking at.

21    All right.  Let's look to the next heading.  I think

22  we may have just covered it.  You want to ensure that there are

23  no illicit wallet withdraws; right?

24  A.    Correct.

25  Q.    And you talked about that, how we're going to go about

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  doing that.  In fact, we suggest that under the receiver's
2  supervision, FX Solutions, Inc. will set up security for
3  withdrawals with the Bitcoin wallet provider as follows.  And
4  we list, Number 1, all Bitcoin withdrawals and transfers from
5  CryptoWatt's wallet will require confirmation by the receiver
6  appointed by the Court and FX Solutions, Inc.'s CFO.  And we
7  could change that to include more people or less, whatever the
8  Court would like to do.

9        But do you think that is sufficient security?
10 **A.**  Yes.  And I want to make sure that we're clear that this
11 isn't just they get an email from those individuals which could
12 be forged or they send a text message; that we're talking about
13 doing a video conference where they're holding up their
14 passport to prove that it's actually them.
15 **Q.**  That's Number 2; right?
16 **A.**  Yes.  There's when you set the account up for knowing your
17 customer to establish I am who I say I am.  And then each time
18 you do the actual transfers, they have to reconfirm who they
19 are.  We're not just talking about having a password or logging
20 into a website or things that you associate with online
21 banking; that this is a much more -- not invasive, but secure
22 and reliable process.
23 **Q.**  You're suggesting a video conference as part of it?
24 **A.**  Yes.

25        MR. KRIS MCLEAN:  If we could turn the page, please.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1    (Displayed.)

2  BY MR. KRIS MCLEAN:

3  **Q.**   We're also suggesting the receiver and the FX Solutions

4  CFO agree on the amount to be withdrawn and transferred.  So

5  that takes at least two people.  And then the withdrawals and

6  transfers are only allowed to a specific exchange specified at

7  the creation of the wallet at the direction of receiver.

8  Right?

9  **A.**   That is correct.

10  **Q.**   And you're willing and able to help the receiver select

11  the wallet based on your expertise; right?

12  **A.**   Absolutely.

13  **Q.**   And how to run this whole security program, you'll help

14  them out?

15  **A.**   Absolutely.

16        And one other point I want to make sure we're clear

17  on is that we're not talking about liquidating all of the

18  Bitcoins every day or every month; that we can specify that

19  only the amount needed to cover bills, to cover the expenses,

20  can be liquidated from Bitcoins into US dollars to cover fees

21  so that this isn't a situation where if we get to the end of

22  this process and the -- if we haven't decided, you know, if

23  things aren't clear, that not necessarily everything will be

24  converted to US dollars.  We can leave the portions that we

25  don't need to pay our bills as Bitcoin so that they're still

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  retaining that value.

2           And the other thing that I wanted to make sure we
3  were clear on was the sense of urgency around what's happening
4  on May 13th with the halving to understand why the -- the
5  timing around the operation of this data center is so critical.
6  Because after May 13th, all of the 32,000 machines that are in
7  that facility are going to lose the majority -- are going to
8  lose the entirety of their value.

9  **Q.**  Because it's going to be so much harder to make a Bitcoin?
10 **A.**  So the way that the Bitcoin protocol was designed that was
11 in the beginning, when it first started, approximately 12 years
12 ago, every time a block was added you would get 50 Bitcoins.
13 And then approximately every four years or, to be specific,
14 every 210,000 blocks that are written, which takes about four
15 years, that number gets cut in half.  So it went from 50 to 25
16 and currently we're at 12 and a half.

17          And at today's difficulty, we will earn approximately
18 10.4 coins every day when Butte is operating at full capacity.
19 Based on that, we will make -- today's Bitcoin price is about
20 $8,000 per coin.  So over the course of a month, we'll make
21 somewhere around 310, 315 coins, times $8,000.  We'll make
22 about $2.4 million.

23          The cost of power today, when you take the generation
24 cost and the transmission cost, is about $41.  So when you
25 multiply all of that out, out power bill is about $1.7 million.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  So today we can still be profitable $800,000 a month of gross

2  profit.  But after May 13th, when the reward goes from 12.5 to

3  6.25, if the difficulty were the same, we would be literally

4  making half as much of money.  We will be making $1.2 million

5  per month, and all of the -- but our power bill will remain at

6  $1.7.

7        So, obviously, no one wants to run a facility that is

8  losing half a million dollars a month in perpetuity.  So every

9  day we are not operating this facility are days that we are

10  never going to get Back that revenue and the revenue is lost.

11  So there's a sense of urgency around maximizing the return on

12  the investment.

13        And then, of course, after the May time frame, or

14  between now and May, we want to refresh with newer hardware

15  that is more profitable and faster, the next generation of

16  equipment.  That is approximately two and a half times as

17  profitable as the current generation of equipment so that even

18  if you were to half the amount of rewards you receive, because

19  the machines are two and a half times more profitable, the

20  facility would actually make more money.

21        THE COURT:  Mr. McLean, I have a question.

22        MR. KRIS MCLEAN:  Go ahead, sir.

23        THE COURT:  You mentioned about the receiver could

24  agree on how much of the Bitcoin to withdraw per day or per

25  time period.  So what happens to a Bitcoin that's floating in

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  the --

2         THE WITNESS:  It remains in the wallet.

3         THE COURT:  But is there any danger that there would
4  be a loss or increase in value of those Bitcoins?  I mean, is
5  there speculation on the future trading on the Bitcoins that
6  are sitting in there?  I'm trying to make sure there's enough
7  sideboards to make sure that the receiver isn't going to be
8  later hit with a claim that he squandered funds because he
9  didn't pull it out or he made a bad decision about how much to
10  pull out.

11         THE WITNESS:  Right.  And so it's difficult to say.
12  Different people who are bulls and bears on Bitcoin will tell
13  you whether or not it's going to stay at 8,000 or go 20,000 or
14  drop to 2,000.  That's impossible to discern.

15         So if the Court wanted to have the most conservative
16  view possible, we could every day convert it to the cash amount
17  on that day.  And so we could just do, you know, 30
18  transactions a month.  Or we could agree that if today's bills
19  are $1.7 million, plus the $250,000, we take out enough
20  Bitcoins to pay the $1.95 million and leave the rest as
21  Bitcoin, with the understanding that this could go up or could
22  go down and that could happen.

23         I'm not going -- I personally have no idea what
24  Bitcoin is going to do.  I don't think anybody does.  And I
25  would be suspect of anyone who would make commitments to which

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1   way it's going to go.  So I think this would be an opportunity

2   for us to rely on -- if we want to be more conservative, we can

3   take it out regularly.  Or you can leave it there with the

4   understanding that we can take it out later.  Or we can even

5   say if it falls below 7,000, to preserve value, we would

6   liquidate at 7,000 so that we're sure to realize as much gains

7   as we can.  I mean, we don't have a preference on that.  Our

8   concern is about operating the facility.  Because after

9   May 13th, the only value -- without putting new machines in,

10  there won't be value in this facility.

11          THE COURT:  Would you contemplate the receiver making

12  those decisions?

13          THE WITNESS:  I don't know that the -- I'm sorry.

14  The decision to sell or not sell?

15          THE COURT:  Yes, decide how much to take out per day.

16  Set a floor.  We're going to sell anything below that floor.

17  I'm worried about setting up a receiver for potential liability

18  from Mr. Goettsche or whoever else has interest in this

19  venture.

20          THE WITNESS:  Yes.

21          THE COURT:  "You lost me lots of money because you

22  didn't handle the timing right."

23          THE WITNESS:  I appreciate your question.  I think

24  it's also important to remember that if we don't operate the

25  facility, there's zero revenue.

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1          THE COURT:  I understand that.  If I'm going to

2   appoint a receiver, I want to know what that person's

3   responsibility would be and what the potential liability would

4   be.

5          THE WITNESS:  So I would say that the most -- the

6   most risk-averse method would be to liquidate the coins

7   periodically, whether that's monthly or whether that's daily.

8   That may not necessarily maximize the revenue, but it's the --

9   I'm sorry -- in terms of trying to time the market for when it

10  goes up and down, but it's a way that you can make sure you

11  realize whatever gains are available with the least exposure.

12         THE COURT:  Is there any information that would be

13  available potentially to the receiver to review saying, "Well,

14  here's the forecast by six prominent traders.  Bitcoin is going

15  to go up for the next six months, or it will be dropping

16  through the floor in a year."  Those kinds of things?

17         THE WITNESS:  There's nothing that's reliable in the

18  same way that you could look at the news and say, "What is the

19  stock market going to do?"  It's just as volatile.

20         And so if your concerns are people saying that --

21  people coming back and saying retroactively that you should

22  have held on to it or sold sooner or sold later, that armchair

23  quarterbacking, Monday morning quarterbacking can't be avoided.

24  So I would say that liquidating as you go is probably the best

25  method to remove the opportunity for someone to say you should

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1    have held onto it or you should have sold sooner.

2            THE COURT:  Okay.  Go ahead, Mr. McLean.

3    BY MR. KRIS MCLEAN:

4    **Q.**   The last heading involves ensuring Bitcoin is converted to

5    USD and moved to the correct bank account.  And you probably

6    covered that already.  But just to summarize, how does that

7    work?

8    **A.**   With the exchange company that you select, that when you

9    create the account, you pre-specify this is the wallet that it

10   will come from and the bank account that it will go to.  And

11   those things can't be changed so that there's just the

12   assurance that the money will end up in the correct account.

13           THE COURT:  Mr. McLean, let me ask a couple of

14   clarifying questions.

15           MR. KRIS MCLEAN:  I'm through, Your Honor, so have at

16   it.

17           THE COURT:  How much contact would you anticipate

18   having with the receiver?

19           THE WITNESS:  Contact?

20           THE COURT:  Daily?  Weekly?  What kind of --

21           THE WITNESS:  So the minimal contact would be if at

22   the end of the month the CFO said, "Here are our bills.  Here's

23   how many coins we have.  This is the price.  This is how many

24   coins we need in order to cover our expenses," and can give

25   those financials for the receiver to review, to verify that

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1  they are correct.  Then they can liquidate the sufficient
2  number of coins to pay the bills.

3          THE COURT:  To pay FX's bills?

4          THE WITNESS:  To cover the expenses of operating the
5  facility, which would be the power cost, which is far and away
6  the biggest, and then the cost staffing for FX to manage the
7  facility.  And that would be sort of the *minimum*.

8          THE COURT:  Right.  Then we have to worry about the
9  interest of Mr. Washington and Mr. Goettsche.  Aren't they
10  entitled to the profits from the operation?

11          THE WITNESS:  Well, how we distribute the profits
12  that come out of it is something that -- I don't know what the
13  right -- I don't want to say that it's right for Kevin to get
14  his money now or he can get it in May.  This is something where
15  I think it would be either the Court's decision or something
16  that can be negotiated between the parties to decide we are
17  going to hold on to all of the Bitcoins, and at the end of this
18  time period when the receivership ends, transfer the coins on a
19  pro rata share to each party's respective wallets.  Or they
20  could negotiate and say, "We're going to sell as we go."  And
21  then the cash would go there.  We could move the cash monthly.
22  We could decide to move the cash at the end.  All of these
23  things, I think, could be negotiated.

24          MR. KRIS MCLEAN:  I think we would suggest, Your
25  Honor, that the profits, such as they are, would be held in

1  escrow somewhere and not distributed.

2        THE COURT:  Held in Bitcoins or converted into
3  dollars?

4        THE WITNESS:  Both are viable, and I would hope that
5  the two parties could agree on what that looks like.

6        THE COURT:  So, first, we're paying the bills, and
7  then we have any profits that are left over to be distributed
8  eventually.

9        MR. KRIS MCLEAN:  Yes.

10        THE COURT:  All right.  The one clarification I have,
11  the halving coming up in May, would the plan be to shut down
12  operations in May or to make a decision about -- and who makes
13  the decision to invest in new equipment and update it and keep
14  the thing running?

15        MR. KRIS MCLEAN:  We would be looking for investors,
16  looking for Mr. Washington, looking for others to invest more.
17  And I think that would be up to the receiver to be making a
18  business decision about what is the best --

19        THE COURT:  So what happens to the -- if we bring in
20  more investors, does that deplete the interest of Mr. Goettsche
21  or Mr. Washington or both?  Now, as I understand, it's about
22  72/28 right now?

23        MR. KRIS MCLEAN:  Yes.

24        THE COURT:  So an investor buys 25 percent.  It comes
25  out proportionally from the two current members?

JEFFREY PAPEN - DIRECT EXAMINATION BY MR. MCLEAN

1            THE WITNESS:  Well, it doesn't have to operate that
2     way.
3            MR. KRIS MCLEAN:  Just -- I don't think you're
4     qualified to talk about this.
5            THE WITNESS:  I apologize.
6            MR. KRIS MCLEAN:  So these are things that the
7     receiver, as an experienced business man, can make an initial
8     determination, work with the owners.  But if there's a dispute
9     that arises, we'll probably be back before the Court asking for
10    a referee.
11           But it seems like, to me, the way that the protocol
12    was set up and the proposed order giving the receiver authority
13    to manage everything is going to allow him to work with the
14    parties, work under that operating agreement that exists right
15    now.  And if there are issues that arise and the parties can't
16    agree, we'll be back here asking for guidance.
17           THE COURT:  And how are you working with
18    Mr. Goettsche?
19           MR. KRIS MCLEAN:  Well, he's got counsel right now
20    and --
21           THE COURT:  But you have counsel for this proceeding.
22           MR. KRIS MCLEAN:  Yes.
23           THE COURT:  Do you contemplate working through
24    Mr. Smith?
25           MR. KRIS MCLEAN:  Right now, that's all I've got,

JEFFREY PAPEN - CROSS-EXAMINATION BY MR. SMITH

1  yes, and we're getting him served today.

2          THE COURT:  Does Mr. Goettsche have a trial date?

3          MR. KRIS MCLEAN:  He doesn't.  He's just arrived in

4  New Jersey.  He was in a hold in Colorado where he was

5  initially arrested, and we have been tracking him through the

6  US Marshal Service, transport system from Colorado to

7  New Jersey where he's facing the charges.  And I received

8  notice this morning that he's actually arrived in New Jersey,

9  which means he'll probably have his arraignment very soon.

10          And Mr. Smith probably knows more about it than I do.

11          MR. SMITH:  I can just tell you his arraignment is

12  next Wednesday, the 15th.

13          THE COURT:  All right.  Thank you.

14          Any more questions, Mr. McLean?

15          MR. KRIS MCLEAN:  No, sir.

16          THE COURT:  Mr. Smith, do you want to cross?

17          MR. SMITH:  Briefly.  Very briefly.

18          THE COURT:  Go ahead, please.

19                          CROSS-EXAMINATION

20  BY MR. SMITH:

21  Q.   So, Mr. Papen, I've listened with great interest to your

22  discussion of the blockchain and how there's a record of all

23  Bitcoin generated by CryptoWatt Mining over its life.  Right?

24  A.   Yes.

25  Q.   And that's an unalterable record?

JEFFREY PAPEN - CROSS-EXAMINATION BY MR. SMITH

1  **A.**   Yes.

2  **Q.**   And I think you testified, when you were talking about

3  transaction security, that there has been Bitcoin transactions

4  security and recording on this ledger, what we call the

5  blockchain, since the inception of CryptoWatt Mining?

6  **A.**   The blockchain would have recorded all of the coins that

7  were generated and what wallets they were assigned to.  So I

8  think I answered your question.

9  **Q.**   Okay.  And that goes all the way back to January 2018, if,

10  in fact, Bitcoins were actually being mined or whenever they

11  first mined a Bitcoin?

12  **A.**   Yes.

13  **Q.**   Do you know if CryptoWatt Mining has a digital wallet?

14  **A.**   I don't know how the wallets were assigned for how

15  Mr. Goettsche managed his finances.  Our configuration or what

16  we managed was what pool server and worker ID do you assign,

17  and that is as much control as we have.  Whoever set up the

18  account and mapped that worker ID with a particular pool server

19  to a wallet, that we did not do for Mr. Goettsche.  That was

20  long before we were involved.

21  **Q.**   Who would have done that?  Mr. Goettsche?  Do you have any

22  sense of who would set up the wallet?

23  **A.**   My guess is that he set up his wallet at his pool server.

24  Because his machines were pointed to BitClub Network, BCN,

25  which is a different pool server.  And it wasn't until

JEFFREY PAPEN - CROSS-EXAMINATION BY MR. SMITH

1   September of 2019, when he had seen how much we had increased

2   Mr. Washington's return, that he had us manage his servers as

3   well and point them to BTC.com, the pool server we were using.

4   But he, again, set up his own account with BTC.com with his own

5   worker ID and his own wallet.  And he gave the configuration

6   information to us, but we didn't manage the wallets or the

7   creation of those wallets.

8   Q.   So if a receiver is appointed by the Court, we're going to

9   have to set up a wallet?

10  A.   Yes, sir.

11  Q.   And who would do that?

12  A.   We could configure it.  But the control of who could do --

13  who could modify who was allowed to take out money from the

14  wallet, we would not be -- I would not include myself, for

15  example.  When we can go through the process of -- like, for

16  example, when you set up a bank account, someone can go to the

17  bank.  But whoever signs the cards authorizing withdrawals can

18  be different people, and that would be the receiver.

19       MR. SMITH:  Okay.  And just so I'm clear is there a

20  distinction between -- so there's 32,000-plus --

21  A.   Right.

22  Q.   -- servers?

23  A.   Yes, sir.

24  Q.   Okay.  I hope I'm using all of the right language.

25       Are all of them owned by CryptoWatt Mining, or are

1  some owned separately by Mr. Washington?  Explain that, please.

2  A.   So the way that we've tracked that is originally we --

3  when we built a parallel network, we picked particular

4  buildings so that we could divide them up eventually between

5  the two.  And then when we were managing all of it, we just

6  collected everybody as one group.  And then of the coins that

7  were generated, divvied them up on a pro rata share.

8          So, originally, we did a physical separation.  And

9  then when Mr. Goettsche asked us to manage his equipment, we

10 made a new wallet that everything got mined to.  And then the

11 proceeds would be distributed from that wallet based on the

12 percentage of ownership.

13 Q.   So can the receiver set up one single wallet that's going

14 to cover the proceeds from all of the machines?

15 A.   Yes.  Yes.  There would be no need to set up multiple

16 wallets.  Because after we pay expenses, you can then divide

17 what personal wallets they -- Bitcoins get transferred into.

18 Q.   So there will be then created, if this all happens, a

19 centralized wallet that would be the first stop for any

20 Bitcoin?

21 A.   Correct.  You could think of it as the receiver's wallet,

22 but then the receiver decides how that would be distributed.

23          MR. SMITH:  That's all I have.

24          THE COURT:  Thank you, sir.

25          Any redirect?

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1    MR. KRIS MCLEAN:  Just briefly, Your Honor, please.

2    THE COURT:  Go ahead.

3                    REDIRECT EXAMINATION

4  BY MR. KRIS MCLEAN:

5  **Q.**    Mr. Smith had just asked you about Mr. Goettsche's wallet

6  initially.  When you came on, he had it pointed to BitClub

7  Network, as you described?

8  **A.**    When we first got there and I did the audit, all of the

9  machines at the Butte facility were pointed toward the BitClub

10  wallet, and there was no reporting that was accurate or

11  internally consistent.  And what I mean by that were the

12  reports that we got were basically Excel spreadsheets that on a

13  daily basis, you couldn't figure out why the earnings were what

14  they were.

15  **Q.**    There was no transparency?

16  **A.**    There was no transparency.

17  **Q.**    And what I want to ask you about is to confirm for us that

18  that network, that BitClub Network, is the one that's described

19  in the indictment presently pending against Mr. Goettsche?

20  **A.**    Yes.

21  **Q.**    And then Mr. Washington asked you to come in and audit

22  this and tell me what's going on; right?

23  **A.**    Correct.

24  **Q.**    And you were able to do that through the measures that

25  you've already described in your testimony today; right?

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1   **A.**   Yes.

2   **Q.**   And, just generally, what were the results of your audit

3   with respect to Mr. Washington's coin?

4   **A.**   With respect to it, the report basically said that there's

5   so much obfuscation and lack of transparency that I can't tell

6   you how much you're losing because I don't trust the reports

7   that you are getting.  I can tell you that theoretically you

8   should be earning this, and you are at least 25 percent below

9   that, which is why we proposed operating his equipment

10  separately and then parallel to what was going on in existence

11  and using BitClub BTC.com for the pool so that he could get

12  daily reports on how many coins he was earning per day and also

13  daily performance data on his approximately 10,000 servers,

14  what each machine was generating so that you can back into what

15  those earnings were based on how many machines were healthy on

16  a given day.

17              MR. KRIS MCLEAN:  That's all I have.

18              THE COURT:  Is the witness excused?

19              MR. KRIS MCLEAN:  Yes, sir.

20              THE COURT:  You may step down, sir.  Thank you.

21              MR. KRIS MCLEAN:  Thank you.

22              THE COURT:  Next witness.

23              MR. KRIS MCLEAN:  We call Mr. Orizotti.

24                      JOHN ORIZOTTI,

25  called for examination by counsel for the plaintiff, after

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1   having been first duly sworn to testify the truth, the whole

2   truth, and nothing but the truth, testified as follows:

3                THE COURT:  Good afternoon, sir.

4                THE WITNESS:  Good afternoon.

5                THE COURT:  Please state your full name and spell

6   your last name.

7                THE WITNESS:  John Richard Orizotti, O-R-I-Z-O-T-T-I.

8                THE COURT:  Go ahead, Mr. McLean.

9                          DIRECT EXAMINATION

10  BY MR. KRIS MCLEAN:

11  Q.   Mr. Orizotti, would you please describe for the Court

12  where you live and what you do for a living.

13  A.   I'm an attorney.  I have been an attorney since 1981.  I'm

14  a member of -- a partner in the Butte firm of Poore Roth &

15  Robinson.  But I've lived in Missoula for the last ten years,

16  and I have a little office, kind of a satellite office, of

17  Poore Roth.

18  Q.   How long have you been a partner at Poore Roth & Robinson?

19  A.   Shoot, since probably 1986 or '7, in there somewhere.

20  Q.   So 38 years or so?

21  A.   Yeah.

22               THE COURT:  34.

23  BY MR. KRIS MCLEAN:

24  Q.   If we can do the math.

25               THE COURT:  Something we don't have, it's

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  transparency.

2  **Q.**    That's right.

3          Could you generally describe for the Court and the
4  record, perhaps more importantly, the nature of your experience
5  and the breadth of your experience practicing as a lawyer at
6  Poore Roth & Robinson, and anywhere?

7  **A.**    I have mostly focused on business-related matters, whether
8  it be contracts or entity formation or transactional real
9  estate type of work.  I also have done a fair amount of
10  commercial litigation and some estate planning and mining law
11  also.  But mostly I would say more of a transactional or
12  business attorney.

13  **Q.**    Have you done any bankruptcy work?

14  **A.**    Yes.

15  **Q.**    And who did you normally or usually represent in that
16  forum?

17  **A.**    The creditor's side.  I've never represented a debtor.

18  **Q.**    So your clients were banks and other secured parties?

19  **A.**    Yes, mostly.

20  **Q.**    What was the nature of your commercial litigation, just
21  generally, that you experienced?

22  **A.**    Transactional types of work as far as -- I've had a couple
23  of mining law litigation cases, oil and gas cases, and then --
24  I'm just trying to think -- litigation defending lenders.

25  **Q.**    Have you been in any business development or transactions

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  outside of your law practice?

2  A.  Yes, sir.

3  Q.  Tell us about that.

4  A.  I've been involved over the years in a number of

5  businesses in which we -- we're still involved in:  hotels,

6  real estate development in Missoula, a golf course in Missoula,

7  real estate development in the Bozeman area, commercial office

8  park in Missoula, downtown -- the Baxter Hotel in Bozeman.

9       So I don't operate these businesses, of course.  We

10  have folks that take care of that.  But I do have quite a

11  bit -- spend quite a bit of time in reviewing reports and

12  things like that of the operations.

13  Q.  Have you been present during the course of the proceeding

14  this morning the entire time?

15  A.  Yes, sir.

16  Q.  Have you reviewed the proposed order appointing receiver

17  that we've set forth in our pleadings?

18  A.  I have, yes.

19  Q.  In fact, you did have some input as to certain terms that

20  we should include and recommend to the Court in that proposed

21  order; right?

22  A.  Yes, I -- you provided me a draft, and I kind of gave you

23  my input, what I thought would be probably the main focus of

24  the receiver.  And I also had the opportunity to talk to

25  Mr. Papen a couple of times on the phone and also to review the

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  Bitcoin protocol that was discussed today.

2  **Q.**   Based on everything that you've heard today in Court as

3  well as your independent investigation in talking with

4  Mr. Papen and others, do you feel that proposed order would be

5  an appropriate one for the situation faced by a receiver if

6  one's appointed in this matter?

7  **A.**   I do.  I do say that the discussion between Judge Morris

8  and Mr. Papen was very relevant with respect to the one subject

9  about withdrawing the Bitcoins, converting them to dollars of

10 the revenue that's needed in excess of the operating expenses.

11 I thought that was very insightful.

12         And my -- I had sort of considered that a little bit,

13 and my thought on that would be something like -- I don't want

14 to expose -- if the Court were to appoint me as a receiver, I

15 don't want to expose myself to that kind of liability or

16 second-guessing.  I'm no investment adviser or anything like

17 that.

18         So I was thinking also that the Court may consider

19 that we may want to do a stop measure at a certain minimum

20 prize.  But I also was hopeful that if I'm appointed receiver

21 that I could work through both Mr. Smith and yourself,

22 Mr. McLean, and see if a protocol with respect to that issue

23 could be developed.

24         I don't know, like what was pointed out, with

25 Mr. Smith, if he's conditioning to -- will continue to

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  represent Mr. Goettsche or how that will work out.  But I

2  certainly would -- if the Court granted me the authority to

3  have that discussion with counsel, I'd welcome that and see if

4  something could be arranged in that regard.

5  **Q.**   Having listened to all of the testimony and considered the

6  issues presented today, are you still willing to be the

7  receiver if appointed by the Court pursuant to the proposed

8  order or whatever order Judge Morris propounds?

9  **A.**   Yes.  Whatever I'm authorized to do by the Court, I'm

10  certainly ready and able to perform it.

11          I think that -- and also Judge Morris asked Mr. Papen

12  about sort of expectations of interaction between Jeffrey and

13  me.  And, you know, the way I view that, I at least -- at least

14  for the, you know, immediate period of time, he's very, very

15  experienced.  And I think we would be interacting, if not

16  daily, every other day.  And that I also would want to make

17  sure I received and understood reports on a daily basis to

18  protect -- to protect the estate here, to protect this

19  business.  That's what my role would be if the Court authorizes

20  it.

21          So my sense is that I would want to sit down with

22  Mr. Papen.  I would want to review all the reports available.

23  I'd also want to be in the loop when servers go down or when

24  they're not performing correctly, and also the verification and

25  confirmation that they are reporting to the right -- to that

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  pool source and as all have been described.  And I'm certainly
2  not an expert in it at all.

3  **Q.**   Do you think the Bitcoin protocol that we set forth would
4  allow you that authority to meet with Mr. Papen and obtain that
5  information?

6  **A.**   Yes.  And I feel very comfortable with the expertise
7  involved through FX Solutions and the support system that's
8  there.  So I feel comfortable that I could carry out the
9  authority that -- if the Court grants, whatever the Court
10  grants to me.

11  **Q.**   And you would expect that same interaction with Mr. Tabish
12  with respect to the operational side of FX Solutions and how
13  the nuts and bolts go together and are run at CryptoWatt's
14  facility in Butte; right?

15  **A.**   Yes.  I mean, with respect to FX Solutions, my proposal
16  would be to enter into a written agreement with FX, to be
17  involved with FX in the discussions with the energy provider
18  and with Northwestern Energy -- of course, those are vital --
19  and to get the necessary capital, whether it's from FX or from
20  Mr. Washington or a combination.  But we need that capital, of
21  course, to pay what's in arrears and to get started.

22           And it would be my goal to get started.  We've got to
23  get started as quickly as possible because each day is lost if
24  it's not in operation.

25  **Q.**   And you would expect to report to the Court on a regular

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1 basis on how things were going?

2 A.   Yes.  I'd definitely expect to report to the Court.

3       And, you know, if I might add too, I would think and
4 would ask the Court, if he's so inclined to appoint a receiver,
5 that my authority relates to getting it going and operated and
6 pay the operating expenses.  I don't think I should have the
7 authority, nor should the Court grant me authority, as to how
8 to distribute profits.  There are two lawsuits here that -- you
9 know, it's not -- I don't have the authority to weigh in on
10 those.

11 Q.   So you would anticipate further contact with the Court
12 about distributing profits?

13 A.   Not only that, but I think a regular -- you know, whether
14 it's 30 days, report to the Court, or whatever the Court wants,
15 yes.

16       MR. KRIS MCLEAN:  I don't have any further questions.
17 Perhaps you do, Your Honor.

18       THE COURT:  Not at the moment.

19       Mr. Smith?

20       MR. SMITH:  I just have one.

21       THE COURT:  Go ahead, please.

22       MR. SMITH:  Thank you.

23                    CROSS-EXAMINATION

24 BY MR. SMITH:

25 Q.   Mr. Orizotti, you are a principal in a very long-standing

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  well-respected law firm in Butte, Poore Roth & Robinson?

2  **A.**   Thank you.  Yes, I am, sir.

3  **Q.**   And my client is very interested just to understand, so I

4  have to ask you.  I hope you understand the nature of this

5  question.  It's just that the Washington family is a pretty

6  renown family in the state of Montana, particularly Kevin's

7  father, Dennis Washington.  Right?

8  **A.**   Correct, yes.

9  **Q.**   And I just need to ask you:  Have you run a conflict check

10  with your office concerning being a receiver in this case where

11  Kevin Washington is one of the parties involved in the whole

12  thing?

13  **A.**   Yes, sir, I have.  Mr. Smith, our firm -- Poore Roth has

14  always -- since, you know, 50 years, has always represented,

15  back then, the Anaconda Company, then ARCO, now British

16  Petroleum.  We have never represented any of Mr. Washington's

17  companies, ever, and just because of our relationship with ARCO

18  and British Petroleum.

19          So I did run a conflict check, yes, and I've never

20  had any dealings.  As a matter of fact, today was the first

21  time I met Mr. Washington.

22          MR. SMITH:  Thank you very much.

23          THE COURT:  Any redirect?

24          MR. KRIS MCLEAN:  No, thank you, Your Honor.

25          THE COURT:  All right.  Mr. Orizotti, you may step

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  down.   Thank you.

2            THE WITNESS:   Thank you, Your Honor.

3            MR. KRIS MCLEAN:   No further witnesses, Your Honor.

4            THE COURT:   All right.   Why don't we take a

5  ten-minute recess.

6            MR. KRIS MCLEAN:   Thank you.

7            THE COURT:   All of the men in the room are looking

8  relieved.

9            MR. KRIS MCLEAN:   Thank you, Your Honor.

10           MR. SMITH:   Thank you, Judge.

11      (Proceedings in recess from 1:13 p.m. until 1:29 p.m.)

12      (Open court.)

13           THE COURT:   Please be seated.

14           So we have two motions pending today.   The first one

15  is the motion for appointment of receiver, and the second

16  motion is filed by Mr. Smith, forcing arbitration -- forcing

17  the arbitration agreement.   Why don't we take up the

18  arbitration agreement first, then we'll go on to see if we need

19  to address the receivership issue.

20           Mr. Smith.

21           MR. SMITH:   Judge, the plaintiffs have filed an

22  action for damages in this case.   They have not filed an action

23  for equitable relief.   And according to the operating agreement

24  that governs the relationship of the parties, and even in the

25  way that this case was pled and about which this case can --

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  you know, the facts about which this case consists, the action

2  must be arbitrated under the clause that we've cited in our

3  brief, 12.1 of their -- as I've said, their operating

4  agreement.

5            I don't see how we can circumvent that or the Court

6  can circumvent that by, you know, seeking a provisional

7  equitable remedy in the receiver.  When this case goes to

8  arbitration, I believe you know that you won't have

9  jurisdiction over the matter during that period of time.

10           We've -- well, that's a different argument.  I'm

11  sorry.

12           So, Judge, I've briefed the issue.  I don't need to

13  argue the law to you.  I think you even know the law, but I

14  just want to renew for the record our objection.

15           THE COURT:  Let me understand your position about the

16  case.  So we have a claim for damages filed by Mr. Washington

17  against Mr. Goettsche, the entities involved here; right?

18           MR. SMITH:  Yes.

19           THE COURT:  All right.  You think that entire lawsuit

20  is subject to arbitration pursuant to the operating agreement?

21           MR. SMITH:  I do, based upon the two claims that were

22  made.

23           THE COURT:  And what about my ability to issue an

24  order regarding the appointment of a receiver?

25           MR. SMITH:  I think there is case law that allows

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1   that, that seems to make a separation and calls -- and allows

2   for the equitable relief of a receiver to be appointed by the

3   Court while still proceeding with arbitration.  That case law

4   exists.

5           THE COURT:  All right.  Well, I've read your brief.

6   Let me hear from Mr. McLean.

7           MR. SMITH:  Are we going to talk about -- am I going

8   to get to talk about the receiver issue after --

9           THE COURT:  Yes, yes.  I want to do this first.

10          MR. SMITH:  Okay.  Thank you.

11          THE COURT:  I want to see if Mr. McLean has devised

12  any scheme to circumvent the Supreme Court's repeated

13  admonishments to the Montana Supreme Court to follow the

14  Federal Arbitration Act.

15          MR. KRIS MCLEAN:  Well, Your Honor, we're looking to

16  the terms of the operating agreement, and Mr. Goettsche points

17  to say one particular term that talks about arbitration if

18  issues within the operating agreement are at issue.  But he

19  ignores Section 12.10, which specifically ops-out from

20  arbitration the disagreement in this case, the proceeding

21  before the Court right now, and that is today the appointment

22  of a receiver.

23          THE COURT:  Right.  I think he conceded there is case

24  law to support equitable remedies.  But as far as the

25  underlying complaint, doesn't he seek monetary damages from

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  Mr. Goettsche?

2          MR. KRIS MCLEAN:  Well, Your Honor, we received this
3  motion last night at 10:20, the motion to submit to an
4  arbitration.

5          THE COURT:  Yes.

6          MR. KRIS MCLEAN:  And we wrote briefs, you know, for
7  several hours last night and submitted them this morning.  If
8  the Court is going to consider this issue entirely with respect
9  to the rest of this lawsuit, we're going to need additional
10  briefing and additional time.  We didn't have a chance to --

11          THE COURT:  I understand.  I understand.

12          MR. KRIS MCLEAN:  Okay.

13          THE COURT:  But you do seek -- you do seek monetary
14  damages?

15          MR. KRIS MCLEAN:  We do.  We do.

16          THE COURT:  And as I understand your complaint, it
17  relates to allegations that Mr. Goettsche breached provisions
18  of the operating agreement.

19          MR. KRIS MCLEAN:  He breached -- it's not so much the
20  operating agreement.  It's not a part of the operating
21  agreement that requires one owner to comply with this fiduciary
22  duty to the other.  That's more of a common law LLC operating
23  concept.  So that's what we're alleging is that Mr. Goettsche's
24  breach of his fiduciary duty under common law to Mr. Washington
25  generated damage.  And that's Count 1.

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1          Count 2, then, is just the actual fraud that we're

2    asserting occurred as a result of the BitClub Network.  As the

3    Court heard today that Mr. Goettsche actually used to mine the

4    Bitcoin produced at Butte to his BitClub Network that is

5    associated with and became the vehicle for the scam, at least

6    alleged, in the indictment.

7          So we've got those two counts.  From our perspective,

8    neither of them are governed or addressed by the operating

9    agreement.

10          THE COURT:  Okay.  Let's focus.  I think that you're

11    correct.  That's a bigger question we're going to have to --

12    I'll give you more than 12 hours to brief.

13          MR. KRIS MCLEAN:  Thank you, sir.

14          THE COURT:  But as far as the authority of the Court

15    to appoint a receiver in the event that the -- even if the

16    arbitration clause were enforceable regarding the remainder of

17    your complaint.

18          MR. KRIS MCLEAN:  I'm sorry.  I couldn't hear you,

19    Judge.

20          THE COURT:  The question is whether even with the

21    potential arbitration of the rest of the dispute, do I have

22    authority to appoint a receiver in the interim and even through

23    the arbitration proceeding?

24          MR. KRIS MCLEAN:  Yeah, you absolutely do, Judge.

25    And you could appointment a receiver, and that receiver could

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  go about his business running this business for as long as it
2  takes, and we can go on to litigate a lawsuit, and the two
3  would never meet.

4          THE COURT:  All right.  So let's transition, then,
5  Mr. McLean.  Give me your arguments on receiver, and Mr. Smith
6  will get a chance to rebut.

7          MR. KRIS MCLEAN:  All right.  Initially, I want to be
8  clear that Mr. Washington is willing to do whatever it takes
9  from a financial standpoint, if the Court does appoint a
10  receiver, to get this business started.  You heard some of the
11  questions about -- or maybe assertions by Mr. Orizotti that
12  we're going to need some money to get started.  And
13  Mr. Washington is willing to do whatever it takes.  And so the
14  money will be there, if the Court appoints a receiver, to turn
15  on the machines and start generating some income and keep these
16  32 employees of FX Solutions in Butte, Montana, working.

17          As you've always heard, if a receiver is not
18  appointed, the business isn't fired up and running again, it's
19  quickly going to not be an asset at all, and all of the workers
20  will be laid off and not brought back to work.  And this asset
21  that is worth between $100 million, $40 million, a huge amount
22  money when it's operating and has these power contracts,
23  becomes substantially less valuable.  And that's what we heard
24  about today.

25          But Mr. Washington is willing to take care of the

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  startup costs and make sure that the receiver has everything he
2  needs to make this a go.

3            Now, the cases that we cited to the Court in our
4  brief requesting this emergency motion and for the Court to
5  appointment a receiver set forth seven factors for the Court's
6  consideration.  You don't need to consider all factors.  You
7  can point to one or two.  But I think when you look at these
8  seven factors, all of them really argue for the appointment of
9  a receiver under these circumstances.

10           The first factor the Court should consider, if it is
11  so inclined, is whether the party seeking the appointment has a
12  valid claim.  Well, Mr. Washington's claim with respect to the
13  receiver is that he has invested tens of millions of dollars in
14  this facility.  And if a receiver is not appointed, he will
15  likely lose all of that money.

16           The second factor is whether there is fraudulent
17  conduct or the probability of fraudulent conduct by the
18  defendant.  And Mr. Goettsche has been indicted by a federal
19  grand jury.  He's going to be making an arraignment next week,
20  apparently, in the United States District Court in New Jersey.

21           And if we look at that indictment, Your Honor, that
22  is attached to Mr. Washington's complaint, you will see that
23  this BitClub Network that you heard about today, that was being
24  operated by Mr. Goettsche and the Bitcoins were being sent to
25  that wallet, is actually the same BitClub Network that's listed

1  in the indictment.  Part of his fraud was the BitClub network.
2  And so, I mean, that factor seems relatively clear that there
3  at least is more likely than not proof that Mr. Goettsche
4  engaged in fraudulent conduct or the probability of fraudulent
5  conduct.

6         The third factor is whether the property is in
7  imminent danger of being lost, concealed, injured, diminished
8  in value, or squandered.  That's clearly been established by
9  the evidence the Court heard today.

10         The fourth category or element is whether legal
11  remedies are inadequate.  And the problem with legal remedies,
12  other than a receiver, is they just work too slowly for this
13  situation.  The receiver can go in as soon as the Court
14  appointments him and start getting this business up and running
15  again.  Other legal remedies are just going to have to wait for
16  the normal course of litigation.  And by the time those were
17  resolved, this facility would be worthless.

18         The fifth factor that the Court can consider is
19  whether the harm to plaintiff by denial of the appointment
20  would outweigh the injury to the party opposing the
21  appointment.  And this is a situation where the appointment
22  actually helps both parties.  Mr. Washington certainly is going
23  to be harmed if the Court does not appointment a receiver.
24  Mr. Goettsche is certainly going to be harmed if the Court does
25  not appointment a receiver.  Both of these owners' interest in

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  this asset need the appointment of a receiver to try to
2  maintain and protect the value.

3       The sixth factor that the Court could consider is the
4  plaintiff's probable success in the action and the possibility
5  of irreparable injury to the plaintiff's interest in the
6  property.  And there again, you know, just from an initial
7  standpoint as we allege in our complaint, the indictment
8  established probable cause, more likely than not, that
9  Mr. Goettsche defrauded Mr. Washington, among others, maybe
10  thousands of people, as described in the indictment.

11       Finally, the Court can consider whether the
12  plaintiff's interest sought to be produced will in fact be
13  well-served by the receivership.  And I think this is a
14  situation that classically, you know, cries out for an
15  independent monitor of the situation.  And Mr. Orizotti is
16  clearly qualified to be the receiver.  And this business needs
17  that neutral party to operate the business so that these Butte
18  workers can get back to work and the very valuable asset that
19  is owned by Mr. Goettsche and Mr. Washington can be preserved
20  and protected if it can.

21       THE COURT:  How is the receiver to be paid?

22       MR. KRIS MCLEAN:  In our proposed order, Your Honor,
23  we set forth an amount of $22,500 a month.  That's just a flat
24  fee that I discussed with Mr. Orizotti -- it's acceptable to
25  him -- based on a general idea on how much work is going to be

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  involved with this.

2          THE COURT:  Where is that in the order?  I didn't see

3  it.

4          MR. KRIS MCLEAN:  I think it's near the beginning.  I

5  don't have the exact paragraph, Judge.  I'm sorry.

6          THE COURT:  All right.  I'll find it.

7          MR. SMITH:  It's on page 12, Judge.

8          MR. KRIS MCLEAN:  That's not the beginning.

9          MR. SMITH:  Paragraph 8.

10          MR. KRIS MCLEAN:  Thanks, John.

11          THE COURT:  You're the one doing math today,

12  Mr. McLean.

13          Go ahead.

14          MR. KRIS MCLEAN:  That would be from the estate of

15  CryptoWatt.

16          Judge, just in conclusion, you know, this Court has

17  the authority, as we've described in our briefing, to do

18  equality in this case; appoint a receiver, as described in the

19  proposed order; and let this very important asset to the

20  community of Butte and these two owners maintain its value and

21  put these people back to work.

22          Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. McLean.

24          Mr. Smith.

25          MR. SMITH:  Thank you, Judge.  I'll be brief.

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1          Judge, I agree with Mr. McLean's assessment that a

2   receiver, at least potentially, and if this CryptoWatt mining

3   company gets up and running again, could be beneficial to my

4   client as well.  So I have no argument with that whatsoever.

5          There was a concern for a bit that should we accede

6   or assent to the appointment of a receiver that we would

7   somehow be waiving our right to an arbitration.  Which when I

8   read just yesterday, actually, ran into the case law -- in

9   fact, *Toyo Tire Holdings of Ams.* and then of course the *Canada*

10  *Life Assurance Company* that's in the briefs, I saw that

11  distinction made between the equitable relief of a receiver and

12  the substantive relief of the rest of the case, that's sought

13  in the rest of the case, and with -- I think I made a pretty

14  good record, but we want arbitration to be compelled -- that

15  we're okay appointing a receiver.

16         That being said, we have proposed to Mr. McLean and

17  his client a proposed order of our own that was prepared by a

18  lawyer who has done a lot of the business work for CryptoWatt

19  Mining, CryptoWatt Investment Partners.  And if we could submit

20  it, if you would allow us to submit by Monday that proposed

21  order with -- it basically took Mr. McLean's order and we pared

22  it down.  We could give you a track changes version of

23  Mr. McLean's order and then a clean copy of what results, if

24  you track the changes or accept the changes, to see if that

25  would be more palatable or would be palatable enough for the

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1   Court.  We would appreciate that.

2           THE COURT:  All right.  Would you want to suggest a

3   receiver as well?

4           MR. SMITH:  You know, I think Mr. Orizotti would do a

5   great job.  I think it's probably good that he doesn't have a

6   -- it sounds like he doesn't have a full-time -- I hope he

7   doesn't have a full-time law practice going because I do think

8   this is going to be a lot of work.

9           I talked to Richard Sampson, Dick Sampson, whom I'm

10  sure the Court knows.  He was a classmate of mine.  But I know

11  that he's -- he still has an ongoing full-time practice.  And

12  so we don't have any objection to Mr. Orizotti.

13          THE COURT:  All right.  Why don't you submit your

14  proposed order.  I'll review that as well.

15          MR. SMITH:  Okay.

16          THE COURT:  Can we get that by Monday?

17          MR. SMITH:  Yes, we can, because we've already

18  tracked changes and redlined it.  So that shouldn't be too

19  tough.

20          THE COURT:  File it as soon as you can.  If you can

21  file it this afternoon, that would be great.

22          MR. SMITH:  I'll talk to business counsel.  I might

23  ask him to prepare something that explains to the Court why he

24  redlined some of the provisions.

25          THE COURT:  All right.  That would be fine.  Thank

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1   you.

2            MR. SMITH:  Thank you.

3            THE COURT:  Mr. McLean.

4            MR. KRIS MCLEAN:  Thank you.

5            I've reviewed Mr. Goettsche's proposed order, and it

6   was provided to us only after this Court set this hearing for

7   this morning.  We've been asking for it for a long time.  We

8   were not provided it until the hearing was imminent.

9            I can tell you that if you get the redline version of

10  it, or even if you don't, we cannot agree to that.  And you

11  will have to sift through and see what you think is most

12  appropriate between the two orders.  But I can tell you that

13  what Mr. Goettsche has decided to try to strike from the

14  proposed are many provisions that are very important to

15  Mr. Washington.

16           THE COURT:  All right.  Well, I'll review it.

17           MR. KRIS MCLEAN:  Thank you, sir.

18           THE COURT:  Okay.

19           MR. SMITH:  Thank you.

20           THE COURT:  All right.  So this matter is submitted

21  for now.

22           Let's talk about scheduling.  I'm going to try to get

23  an order out by Monday, if I can.  I think before I issue an

24  order I would want to consolidate the cases.  So if you can get

25  that filed as soon as you can.

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1          MR. KRIS MCLEAN:  We can do it right now if that

2   works.

3          MR. SMITH:  Orally?

4          MR. KRIS MCLEAN:  That --

5          MR. SMITH:  That works for me if it works for the

6   Court.  Otherwise, I can have Mr. Brooke get something filed.

7          THE COURT:  Well, I'm perfectly happy to do it.  My

8   colleague won't be as thrilled.

9          Why don't you file -- we'll do a motion here.  I'll

10  grant your motion to consolidate the two cases to be followed

11  up by a written motion, and I'll grant that as well.

12          Hold on.  Let me make sure I'm not forgetting

13  something.

14          So the case in 2003, I think that's the Tabish

15  filing, that's the one in front of Judge Haddon.  Correct?

16          MR. KRIS MCLEAN:  Yes.

17          THE COURT:  All right.  And you understand the

18  alleged deficiency there?

19          MR. KRIS MCLEAN:  I do.

20          THE COURT:  Yes.  Resident, not citizen.

21          MR. KRIS MCLEAN:  Right.

22          THE COURT:  Although it does later state in the same

23  paragraph that the Court has jurisdiction given the amount in

24  controversy and the fact that the parties are citizens of

25  different states.  You do state that.

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1     MR. KRIS MCLEAN:  Yes, sir.

2     THE COURT:  So I am willing to agree to the fact that
3  I do have jurisdiction.

4     So file a written order in each case asking to be
5  consolidated with this case, and I will grant that as soon as I
6  receive it.  But file one in Judge Haddon's court informing him
7  that you've asked this Court to consolidate the cases.

8     MR. KRIS MCLEAN:  We should file that one as well?

9     THE COURT:  Yes.  We had an issue with a case I
10  consolidated last year from his Court, and we didn't do it
11  properly.  So let's make sure we follow all of the --

12     MR. KRIS MCLEAN:  To make sure that we do it properly
13  this time, you're suggesting that we file a notice to
14  Judge Haddon that we filed a motion to consolidate in front of
15  you?

16     THE COURT:  Yes.  And then why don't you file a
17  motion in his Court with the notice of the motion to dismiss
18  that case.

19     MR. SMITH:  Okay.  So a notice of the motion to
20  consolidate in your court, and a motion to dismiss in his
21  court.

22     THE COURT:  Correct, that case, yes.  So it's off the
23  books.  It no longer exists.  Mr. Tabish's case and
24  Mr. Washington's case will be heard in this court.

25     MR. KRIS MCLEAN:  All right.  Are we going to have

JEFFREY PAPEN - REDIRECT EXAMINATION BY MR. MCLEAN

1  one caption then?

2          THE COURT:  It's up to you.

3          MR. SMITH:  Let's not go that far right now.

4          THE COURT:  I wouldn't do that at this point.  I

5  think it's inappropriate given the facts and the circumstances.

6          MR. SMITH:  Yes.  And one's a partner and one's a

7  subcontractor.

8          THE COURT:  Their interests may not always be

9  aligned.  So go ahead and get that filed.

10          MR. SMITH:  Thank you.

11          THE COURT:  All right.  Anything else to address?

12          MR. KRIS MCLEAN:  Not from the plaintiff's

13  perspective.

14          THE COURT:  Mr. Smith?

15          MR. SMITH:  Nothing from the defendant.

16          THE COURT:  All right.  I'll try to have an order out

17  Monday, as I said.

18          Mr. Datsopolos, anything you want to add, sir?

19          MR. DATSOPOLOUS:  I'm just listening, Your Honor.

20          THE COURT:  All right.  I hope everything you heard

21  was okay.

22          We'll be in recess.  Thank you.

23      (The proceedings concluded at 1:51 p.m.)

24

25                      --oOo--

REPORTER'S CERTIFICATE

REPORTER'S CERTIFICATE

1

2          I, Yvette Heinze, a Registered Professional
3   Reporter and Certified Shorthand Reporter, certify that the
4   foregoing transcript is a true and correct record of the
5   proceedings given at the time and place hereinbefore mentioned;
6   that the proceedings were reported by me in machine shorthand
7   and thereafter reduced to typewriting using computer-assisted
8   transcription; that after being reduced to typewriting, a
9   certified copy of this transcript will be filed electronically
10  with the Court.

11         I further certify that I am not attorney for, nor employed
12  by, nor related to any of the parties or attorneys to this
13  action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Great Falls,
15  Montana, this 17th day of January, 2020.

16

17                              /s/ Yvette Heinze
                              _____
18                              Yvette Heinze
                              United States Court Reporter
19

20

21

22

23

24

25